# United States Court of Appeals
## For the First Circuit

No. 15-1672

UNITED STATES OF AMERICA,

Appellee,

v.

PAUL R. HINKEL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Thompson, Selya, and Kayatta,
Circuit Judges.

Christine DeMaso, Assistant Federal Public Defender, Federal Public Defender Office, District of Massachusetts, for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

September 20, 2016

**KAYATTA**, **Circuit Judge**.  After being ensnared by a law enforcement sting operation, Paul Hinkel was charged with using a means of interstate commerce (the internet) to entice a minor to engage in illegal sexual activity in violation of 18 U.S.C. § 2422(b).  He was convicted following a jury trial and sentenced to ten years' imprisonment, to be followed by five years' supervised release.  On appeal, he claims that a variety of alleged errors undermined the integrity of the jury's verdict and the appropriateness of his sentence.  After careful review, we affirm both Hinkel's conviction and the bulk of the sentence imposed by the district court, finding cause to alter only two conditions of Hinkel's supervised release.

## I.    Background

At trial, the government relied chiefly on evidence of electronic messages exchanged between Hinkel and government agents posing as a fifteen-year-old girl and her mother.  Because Hinkel's challenge trains partly on the sufficiency of the government's evidence, we summarize this back-and-forth in considerable detail, vulgar and lewd as it is.

On February 14, 2014, an agent with the Department of Homeland Security placed a personal advertisement on the "Casual Encounters" online message board, a subsection of the website Craigslist frequented by those seeking adult sex partners.  Using the name "Lisa Richards," the agent published a post entitled "mom

with daughter looking--w4m--38 (Boston)."[1]  In its entirety, the post stated: "open minded mom DDF with daughter looking for male that might be interested in taboo relationship, some dom........ needs to be discreete though.  if you have an interest in a interesting relationship contact me, use intersting in subject line.  we will chat off CL."[2]

At 12:54 pm that day, Craigslist user "ctautumn," later identified as Hinkel, responded to the advertisement via email using the subject line "VERY INTERESTING AND INTRIGUING."  Hinkel told "Lisa" that he was "an experienced Daddy/Dom and [he] ha[d] been looking for this type of scenario."  He then listed some of his "taste[s]" and provided graphic descriptions of sexual acts that he imagined engaging in with "Lisa" and her daughter.  Forty-five minutes later, the agent responded, writing that "she" was "trying to introduce [her] daughter to sex" and asking if Hinkel "mind[ed] if shes young?"  Prompted by Hinkel's responsive request for her daughter's age, "Lisa" informed Hinkel that her daughter "Samantha" was "15 but experienced."

---

[1] According to trial testimony, the use of "w4m" signified that the poster was a "w[oman]" seeking a "m[an]."  Throughout this opinion, we reproduce the text of Hinkel and the agents' communications warts and all, with minimal editorial revisions for clarity.

[2] Testimony reflected that in the parlance of these online postings, "DDF" meant "drug and disease free," "dom" meant "dominate," and "CL" meant "Craigslist."

Seven minutes later, at 2:05 pm, Hinkel responded: "Sounds very naughty! I am concerned about her age since legally she should be 16 or older."[3] He asked whether "Lisa's" daughter had "played in this type of scene before" and whether "Mommy and daughter play together as well," stating that he found "that kind of play so very erotic," and that it was a "big turn on for [him]." In response, at 2:10 pm, "Lisa" wrote, "shes not [16 or older] so i guess this conversation is over." But Hinkel insisted otherwise, replying, one minute later, to say, "Nope..... It is not over! I want to talk more! I'm very intrigued by it all. Such taboo and naughty play!!!!"

Over the course of roughly the next month, Hinkel corresponded frequently and in lurid detail with "Lisa" and her fictitious daughter "Samantha." In subsequent emails, "Lisa" told Hinkel that she was looking for a man to "teach[] her [daughter]" and that she wanted "Samantha" "to experience sex with a man the right way." Hinkel frequently expressed eagerness to perform this role, describing his own sexual desires in detail. From time to time, though, he also expressed what he called "conflicting

_____

[3] Hinkel was correct about this as a matter of Massachusetts law, see Mass. Gen. Laws ch. 265, § 23; ch. 277, § 39, meaning that he would not have been guilty of the crime of conviction had he simply responded by stating his intention to wait until "Samantha" turned sixteen to engage in the sexual conduct.

- 4 -

feelings" regarding the criminal conduct he was preparing to engage in. At one point Hinkel told "Lisa":

> I once placed an ad looking for this very type of scenario, but to be honest the ad stated that the daughter was to be of legal age. I was taken back a bit when you said she wasn't. The last thing I want to do to any girl is damage her emotionally. I'm very caring. As long as she is desires this, I am game.

On another occasion, Hinkel wrote "Lisa" that when he arrived to meet "Samantha" he would "play it by ear and gauge it based on Samantha's feelings and comfort level," saying that he was "nervous . . . [to] be with such a young girl" and "sooooooooo very concerned about her and how she will feel." "Lisa" reassured Hinkel, saying "i think you will love her...and i appreciate the way you describe our situation :)," telling him that the planned encounter would be "such an amazing experience for us to have together."

Hinkel and "Lisa" formed plans to stage their encounter with "Samantha" at "Lisa's home" in Watertown, Massachusetts, on March 19, 2014. A week before, Hinkel exchanged emails directly with "Samantha." Referring to her as "sweetheart," Hinkel promised to make the experience "fun and enjoyable" for this fifteen-year-old girl. When "Samantha" said that she liked it when she "rub[bed] herself," Hinkel asked if she would like him to "touch [her] there as well." In one of his final messages to "Lisa," Hinkel asked whether "Samantha" knew she could never tell anyone

- 5 -

about their planned encounter because, in his words, "you and I can get into a lot of trouble.  Even years later."

On the appointed day, Hinkel arrived at the Watertown residence where he was greeted by arresting officers.  He consented to a search of the bag he was carrying and of a lockbox in his vehicle.  These searches--and later searches of his home and work computers--yielded evidence, ultimately introduced at trial, that we will discuss in greater detail later in this opinion.

## II.  Analysis

### A.  Entrapment

Hinkel does not contest that he was the author of the "ctautumn" emails and text messages sent to the government agents.  His chief defense at trial was entrapment.

The defense of entrapment "exists to prevent 'abuse[]' of the 'processes of detection and enforcement . . . by government officials' who might instigate an illegal 'act on the part of persons otherwise innocent in order to lure them to its commission and to punish them.'"  United States v. Díaz-Maldonado, 727 F.3d 130, 137 (1st Cir. 2013) (alterations in original) (quoting Sorrells v. United States, 287 U.S. 435, 448 (1932)).  When the defense is properly raised, we apply a two-part test.  First, we look at the government's conduct to see if it is of the type that would cause a person not otherwise predisposed to commit a crime to do so.  See id.  Examples of such "government overreaching"

include "excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive." United States v. Gendron, 18 F.3d 955, 961-62 (1st Cir. 1994). If the government does employ "methods of persuasion or inducement that create a substantial risk that . . . an offense will be committed by persons other than those who are ready to commit it," Model Penal Code § 2.13(1)(b), "we proceed to a second step and look at the particular person to see if that person was in any event predisposed to commit the crime," Díaz-Maldonado, 727 F.3d at 137; accord Gendron, 18 F.3d at 962-63.

In seeking an entrapment jury instruction, a defendant must first shoulder the "modest" burden of making a prima facie showing that there is some evidence both elements are satisfied in his or her case. United States v. Vasco, 564 F.3d 12, 18 (1st Cir. 2009). If this "'entry-level burden' of production," Díaz-Maldonado, 727 F.3d at 139 (quoting United States v. Coady, 809 F.2d 119, 122 (1st Cir. 1987)), is satisfied--as it clearly was in this case, see, e.g., United States v. Gamache, 156 F.3d 1, 9-11 (1st Cir. 1998)--then the defendant is entitled to a jury instruction explaining the defense. In addition,

> the burden shifts to the government to prove beyond a reasonable doubt one of two things, either of which defeats the defense: that the government did not wrongfully induce the accused to engage in criminal conduct or that the accused had a predisposition to engage in such conduct absent the inducement.

- 7 -

United States v. DePierre, 599 F.3d 25, 27 (1st Cir. 2010).

The district court instructed the jury on the parameters of the entrapment defense using the pattern jury instructions commonly used by district courts in this circuit, declining to give a lengthier instruction requested by Hinkel. The court also denied Hinkel's motion for judgment of acquittal premised on the government's failure to offer evidence sufficient to remove the inference of entrapment from the proceedings. See Fed. R. Crim. P. 29. Hinkel challenges both of these unfavorable decisions on appeal.

## 1.    Sufficiency of the Evidence

Hinkel put a credible entrapment case to the jury by arguing that the government's bundling of licit and illicit sex into a package deal led him to go where he never would have gone but for the government's clever and sophisticated inducement. The government went to lengths to create a dressed-up window of opportunity for the crime to be committed and, on numerous occasions, downplayed the harm that could be expected to flow from the commission of the crime by describing how "amazing" the encounter would be, how "excited" "Samantha" was, and how "Lisa" "appreciate[d]" how "honest and caring" Hinkel had been in his messages. As in virtually any sting operation, the fictitious co-conspirator here also sought to allay concerns about detection by

the authorities and to build credibility with the target of the investigation through frequent, familiar communication that undoubtedly took the "edge" off of the reprehensible conduct under contemplation. As for predisposition, Hinkel points out that he had never previously been convicted of a crime, had raised two adult children and had not been accused of having an inappropriate relationship with either of them, and that the government had not uncovered any evidence suggesting that he had other underage victims.

The jury, though, was not buying Hinkel's view of the evidence. So the question for the district court, and now us, is whether the evidence of both wrongful inducement and lack of predisposition was so one-sided that a reasonable jury could not have found beyond a reasonable doubt that the government carried its burden of negating the entrapment defense. This question of evidentiary sufficiency is a question of law that we consider de novo. United States v. Prieto, 812 F.3d 6, 13 (1st Cir. 2016).

We resolve that question in the government's favor. Crucially, the government informed Hinkel at the very outset of the exchanges--before rolling out the force of its enticements-- that the daughter was only fifteen years old. Promptly thereafter (only about an hour and fifteen minutes after Hinkel first responded to the advertisement, and just six emails into the exchange), the agents pointblank offered him an unambiguous

opportunity to walk away. The precise words exchanged merit attention. When told the girl's age Hinkel voiced no firm objection. Rather, he expressed "concern," and then asked for more information about her experience. A government agent intent on inducement might well have simply responded by answering the question with assurances about her experience. Instead, the agent treated the expression of concern as a likely objection, and volunteered that the "conversation [was] over," thereby giving Hinkel an easy out before he crossed the threshold that led to the subsequent enticement and assurances that could otherwise be seen as creating a disposition where none previously existed. Equally importantly, upon learning the daughter's age and recognizing the illegal nature of the proposed relationship, Hinkel explained his refusal to walk away by citing the "taboo" nature of the proposal as that which made it attractive to him: "I'm very intrigued by it all. Such taboo and naughty play!!!!"

Hinkel did thereafter make statements that implied some residual conflict concerning the illegality of the proposal, but never because he viewed the command of the law as indicative of what is right and wrong. Rather, his concern about the illegality of the proposed conduct was one that was assuaged by arrangements to minimize detection (i.e., confirming that "Samantha" was told to keep their activities secret). In this respect, he was like a putative bank robber who hesitated only to make sure that the

bank's security system was down. He also made clear his position that he would do nothing that, in his judgment, harmed "Samantha." But, of course, that is a judgment that the law does not allow him to make, anymore than it allows a person to kill only those thought to deserve death. In this respect, Hinkel's self-serving arrogance in relying on his own version of right versus wrong reasonably might be seen as an ingredient in his predisposition to commit the crime.

In any event, the important point is that Hinkel was offered and declined a clear exit at the outset. Hinkel was not a person who entered a nightclub only to find out several hours later that it was a bordello. Rather, he was more like the person who confirmed at the front door the nature of the activity being offered, and then entered precisely because its greater than expected "taboo" aspects attracted him. Given such a chronology, a jury could easily find beyond a reasonable doubt that the agents' subsequent enticements and assurances, much like those of a pimp,[4] were simply reasonable efforts to negotiate the arrangement rather than wrongful overreaches aimed at using pressure to create a crime. "This is not a case . . . in which a government agent

---

[4] It is unfortunately not far-fetched to encounter parents pimping their minor children on the internet. See, e.g., Aisha J. v. Ariz. Dep't of Econ. Sec., No. 1 CA-JV 11-0161, 2012 WL 666573, at *2 (Ariz. Ct. App. Feb. 28, 2012).

refused to take 'no' for an answer and persisted in recruiting a target."  Díaz-Maldonado, 727 F.3d at 137.

This is also not a case like United States v. Poehlman, 217 F.3d 692 (9th Cir. 2000), where government agents first established, over the course of six months, a close relationship with a lonely target whom they then enticed by slowly "play[ing] on [the target's] obvious need for an adult relationship, for acceptance of his sexual proclivities and for a family, to draw him ever deeper into a sexual fantasy world involving these imaginary girls," id. at 702.  Similarly, in State v. Canaday, 641 N.W.2d 13 (Neb. 2002), undercover law enforcement agents strung an advertisement respondent along for four months before clearly establishing that the target was expected to have sex with the fictitious pen pal's children as a requirement of any relationship with the mother, see id. at 17–20.

Here, the government's tactics as they played out involved no "psychologically 'graduated' set of responses to [the target's] own noncriminal responses, beginning with innocent lures and progressing to frank offers."  Gendron, 18 F.3d at 963. Rather, the initial lure was ambiguous (mother and daughter in "taboo" and "interesting" arrangement), and the ambiguity was thoroughly and promptly eliminated before Hinkel sought to explore and act on the further enticements.

Because we find that the evidence supported a finding that the government did not wrongly induce Hinkel to engage in criminal conduct, we need not reach the question of whether the government also sufficiently demonstrated that Hinkel was predisposed to commit the kind of offense in question absent any governmental involvement. See United States v. Walter, 434 F.3d 30, 37 (1st Cir. 2006) ("In addressing Walter's primary argument that the government failed to carry its burden of proving that no entrapment occurred, we again note that the government's burden is met if it proves beyond a reasonable doubt that either element of the defense, inducement or lack of predisposition, fails."); cf. United States v. Nieves-Burgos, 62 F.3d 431, 434 (1st Cir. 1995) ("[W]hen a jury returns a general verdict of guilty on a single count charging more than one criminal act, the verdict stands if the evidence sufficiently supports any of the acts charged.")

## 2. Instructions

Hinkel further faults the district court for refusing to give his requested entrapment instruction. Instead, the court gave the pattern jury instruction on entrapment commonly used by district courts in this jurisdiction. See Pattern Crim. Jury Instr. 1st Cir. § 5.05 (1998). The chief distinction between the two is that Hinkel's version included examples of government

- 13 -

activity that might amount to improper inducement to commit a crime.[5]

We see no abuse of discretion in the court's decision or legal error in its instruction. Arguing otherwise on appeal, Hinkel relies principally on United States v. Montañez, 105 F.3d 36 (1st Cir. 1997). The defendant in Montañez hung his entire defense on the theory that he was entrapped by a government agent posing as a female friend who repeatedly beseeched him to obtain cocaine for her to resell, claiming that she would lose her children if he did not help her earn money. Id. at 37–38. When instructing the jury on entrapment, the district court gave several examples of inducement by coercion but refused to include examples of entrapment based on appeals to sympathy. Id. at 38 & n.3. We

---

[5] Hinkel had requested that the district court tell jurors that:

> Improper inducement may include persuasion, false statements, excessive pressure by the officer, an undue appeal to sympathy, psychological manipulation, or other governmental conduct that creates a risk of causing an otherwise unwilling person to commit the crime charged. Even very subtle pressure, if skillfully applied, can amount to inducement for purposes of the entrapment defense. Some of the inducement factors relevant to enticement of a minor to engage in sexual activity may include a) whether the government made the initial contact; b) whether the government introduced the topics of sex and meeting in person; and c) the extent to which the government influenced the defendant's behavior by portraying the minor as sexually precocious.

- 14 -

reversed, ruling that by both providing the coercion examples and "omitting any 'sympathy' examples, the trial court may well have left the jury with the mistaken impression that coercion is a necessary element of entrapment and, in this case, such a misunderstanding could well have affected the outcome."  Id. at 39.

Here, the district court did not instruct on entrapment by setting out some examples of inducement while leaving out other, more pertinent examples.  In its discretion, the court simply stuck with the standard form, accurately describing the generic defense of entrapment, and correctly outlining the elements.  Unlike in Montañez, this instruction "adequately inform[ed] the jury of [the defendant's] theory of defense," id. at 40, and did not suggest that the conduct here was not wrongful by omitting it from a description of conduct that was wrongful.

B.   Evidentiary Issues

On appeal, Hinkel renews his objections to several unfavorable evidentiary judgment calls made by the district court during the course of the trial.  Hinkel challenges: (1) the admission of seventeen photographs and five sexually explicit cartoons discovered on his work computer; (2) the admission of evidence of sexual paraphernalia and children's clothing found in the trunk of his car on the day of his arrest; (3) the exclusion of evidence of a prior sexually-tinged electronic conversation

with an adult he met online; and (4) the exclusion of certain text messages Hinkel sent to "Lisa" that, he argues, would have "contextualized the government's facially inculpatory evidence." We address each evidentiary challenge in turn.

### 1. The Photographs and Cartoon Evidence

A post-arrest forensic examination of Hinkel's computer yielded twenty-two electronic images that were later introduced at trial. Seventeen are photographs of Hinkel, apparently self-taken. The remaining five are drawings of anime characters. Once the district court ruled that Hinkel was entitled to a jury instruction on entrapment, the government offered and the district court admitted, over Hinkel's objection, both sets of evidence as probative of Hinkel's predisposition to commit the crime of conviction.[6] The images, the court reasoned, were probative of Hinkel's predisposition to commit a sex crime involving a minor because they demonstrated Hinkel's interest in "playing out a role of a hypersexualized child in need of chastisement," a fantasy that he later sought to actualize through his communications with "Lisa" and "Samantha." The government briefly discussed these images at trial in the course of its examination of the forensic

---

[6] Much of this evidentiary contest played out in advance of trial, with the district court informing the parties how it would rule were the entrapment issue to arise at trial, as it ultimately did. Hinkel objected when the images were introduced, dooming the government's appellate argument that the dispute has not been properly preserved.

technician and again during closing arguments. Jurors were, of course, free to peruse the contents of the entire report.

Evidence of another act is ordinarily impermissible "to show that on a particular occasion the person acted in accordance with" the character manifest in the other act, Fed. R. Evid. 404(b)(1), but such evidence may be introduced "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," id. 404(b)(2). "[I]n situations where the defendant employs entrapment as a defense to criminal liability, prior bad acts relevant to a defendant's predisposition to commit a crime are highly probative." United States v. Van Horn, 277 F.3d 48, 57 (1st Cir. 2002); cf. United States v. Thomas, 134 F.3d 975, 980 (9th Cir.), as amended on denial of reh'g (Apr. 10, 1998) ("For the jury to find predisposition beyond a reasonable doubt, it must consider the defendant's character."). But even if evidence of a defendant's prior acts or his or her character has "special relevance" to a disputed issue such as predisposition, such evidence "may not be admitted if . . . its probative value is 'substantially outweighed by the danger of . . . unfair prejudice, confusion of the issues, or misleading the jury.'" Van Horn, 277 F.3d at 57 (quoting Fed. R. Evid. 403).

We review the court's decision to admit this evidence for abuse of discretion. Id. at 56. Because the "balancing act"

demanded by Rule 403 is a "fact-sensitive enterprise" best left to the trial judge, "[o]nly rarely and in extraordinarily compelling circumstances will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." United States v. Vizcarrondo-Casanova, 763 F.3d 89, 94 (1st Cir 2014) (alteration in original) (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1988)); see also United States v. Majeroni, 784 F.3d 72, 76 (1st Cir. 2015) ("In exercising their broad discretion under Rule 403, trial judges have a feel for the evidence and the courtroom that is difficult to replicate on the pages of a transcript, so our deference to judgment calls of this type is great.").

We consider first the five cartoons, which consist of detailed anime drawings of adults and minors engaged in sex acts, sometimes in bondage. It was well within the trial court's discretion to admit these cartoons found on Hinkel's computer depicting sex with children as probative of Hinkel's predisposition. Cf. United States v. Chambers, 642 F.3d 588, 595–96 (7th Cir. 2011) (images of child pornography possessed by defendant admissible to show "sexual inclination towards children"); United States v. Brand, 467 F.3d 179, 199-201 (2d Cir. 2006) (evidence of "possession of images of child pornography and child erotica" admissible to show defendant predisposed to commit

- 18 -

"sexual offenses against children").  Hinkel could hardly challenge the government to prove his predisposition to engage in sex with a minor while simultaneously barring the government from presenting proof that he possessed depictions of adults having sex with minors.

The seventeen photos of Hinkel require a different analysis.  None involve children.  Rather, thirteen pictures show Hinkel wearing women's underwear,[7] sometimes with his genitalia visible, one shows him prepared to punish himself, two show his erect penis, and two present views of his spread buttocks.  What properly probative role these pictures had in this case is a mystery.  The government forthrightly confesses that "they played virtually no role in the government's case or its response to Hinkel's entrapment defense."  Egged on less frankly by government counsel at trial, the district court hypothesized that the pictures were all relevant to the entrapment defense.  The reasoning seems to be that in one of the pictures Hinkel appears to wear a child's tutu, so if Hinkel fantasized himself as a child, that reasonably suggests he was predisposed to have sex with a child.  No evidence at all supported this hypothesized nexus.  Nor does the nexus apply, even by its own terms, to sixteen of the seventeen pictures.

---

[7] Trial testimony indicated that some of the items of clothing worn by Hinkel in these photos appeared to be among those found in Hinkel's vehicle at the time of his arrest.  See infra Part II.B.2.

- 19 -

The Supreme Court has cautioned that "evidence that merely indicates a generic inclination to act within a broad range, not all of which is criminal, is of little probative value in establishing predisposition." Jacobson v. United States, 503 U.S. 540, 550 (1992). Our own court has rejected as impermissible "the inference . . . that the tendency to engage in unusual, albeit legal, sexual activity with an adult indicates a predisposition toward pedophilia." Gamache, 156 F.3d at 11. In sum, the photos had virtually no probative force on any issue properly before the jury.

We turn therefore to the issue of prejudice. In most circumstances, the prejudicial impact of these photos would be patent and substantial. Knowledge of Hinkel's licit but unusual sexual practices and his attitude toward sex might cause some jurors to think that his proclivities knew no bounds, licit or otherwise. In this case, though, this prejudicial potential was largely cumulative, or redundant, because of the email exchanges put before the jury. In these properly admitted exchanges evidencing both the crime and the facts relevant to the entrapment defense, Hinkel repeatedly and lewdly described his preferred sexual practices, including practices likely viewed by some jurors as more unusual than what the pictures showed. Also properly admitted were the graphic anime pictures, the relevant prejudicial impact of which went much more directly to the heart of the case.

- 20 -

The risk of incremental prejudice from the photos was further blunted by the district court's prophylactic statement to the jury earlier in the trial that it was not to act as "the bedroom police" and that "if we get evidence in this case of cross-dressing or bondage and discipline or, within limits, sadomasochism, that whatever you may think about that conduct, among consenting adults . . . . That's not criminal."

All in all, we have evidence of very little probative value that was nevertheless highly unlikely to have caused any incremental prejudice in the context of this particular record already replete with evidence of Hinkel's sexual behavior and plans. Whether that means that, net-net, the district court did not abuse its discretion, or that error exists, but it is harmless, we need not decide. In either event, Hinkel loses.[8]

### 2. Other Evidentiary Challenges

Law enforcement officers found a lockbox in the truck Hinkel drove to the scene where he intended to consummate the

---

[8] For this same reason, it was not plain error for the district court to have failed to repeat without request its earlier instruction that the jurors were not "bedroom police." Trial counsel, too, may have had perfectly rational tactical reasons to refrain from seeking the repetitive instruction. See United States v. Fanfan, 468 F.3d 7, 12-13 (1st Cir. 2006) ("[M]any defense lawyers would shrink from an instruction that the jury should not count [a defendant's] propensity for [a particular crime] against him. Rather than erasing the risk that the jury would misuse the bad act evidence, such an instruction could easily invite the jury's attention to a quite natural inference.").

crime.  After securing Hinkel's consent, they searched the lockbox and discovered a cache of sexual paraphernalia, including women's clothing and underwear, children's underwear, and sex toys among other objects.  Over objection, the district court admitted evidence of this material, finding it "probative of [Hinkel's] then present intent."  See Fed. R. Evid. 803(3).  Hinkel argues that this evidence was both irrelevant and unfairly prejudicial.

We disagree:  it was no abuse of discretion to let the jury learn of the sex-related objects Hinkel brought with him from Connecticut to Massachusetts for the encounter with "Lisa" and "Samantha."  All of this evidence went to helping the government prove its affirmative case that Hinkel was not all talk and no action.  In short, the objects were relevant--and highly so-- because Hinkel brought them to the scene of the meeting with Lisa, evidencing that sex was the purpose of that meeting.  Hinkel argues that he only intended to use what he carried out of the truck. But a jury could reasonably find that he brought all of the items as possible objects to use with "Samantha."  After all, he had told "Lisa" that he would "play it by ear" and "see how it went" with "Samantha."  To the extent the objects also ran the risk of eliciting juror disgust, and thus prejudice, the balance here was one that the trial judge had ample discretion to weigh.

Hinkel also challenges two decisions by the district court excluding evidence he sought to admit.  One piece of evidence

was a fragment of a 2010 online chat exchange recovered from Hinkel's work computer.  The exchange occurred between two users, "fun2day07" (Hinkel, by his own assertion) and "purpleangel1219," that apparently took place in March 2010.  At one point in the chat transcript, "purpleangel1219" asked Hinkel (assuming he is, indeed, "fun2day07") if he ever "want[ed] to play with [his daughter]" and Hinkel said he had not and "would never do any[thing] like that."  Counsel for Hinkel sought to introduce the chat transcript as evidence of lack of predisposition and the district court ruled the exchange irrelevant.  For several reasons, this is a judgment we will not disturb.  For one, the exchange occurred several years before the events in question.  Second, there was no suggestion in Hinkel's prosecution that he abused his own children.  Leaving aside questions about authenticity, hearsay, and completeness, excluding this evidence on relevance grounds was a decision well within the judge's range of discretionary authority.

Hinkel also sought to admit certain text messages sent by him, which he says provided context for two other messages that were read aloud by a government witness at trial.[9]  The text

_____

[9] These text messages sent by Hinkel to "Lisa" read, "I'm glad and eager to hear her response.  Makes me aroused to think of her like this," and, "Very hot, I could even use a toy on her, while in that position, and make her cum several times before I take her."

messages read aloud related to Hinkel sending "Lisa" an explicit photograph. Defense counsel objected to the text messages in the first instance but then, on cross examination, sought to introduce other parts of the conversation to place the messages in context. The district court ruled that this was impermissible since the defense was objecting to the messages' admissibility. On appeal, Hinkel claims he would have used the opportunity to highlight a text message wherein he wrote, "Too bad, looks like I scared you with that photo. Take care."

The district court's treatment of this evidence was inconsistent at best. But we fail to see how this lost opportunity to introduce evidence of Hinkel apologizing for sending an explicit photograph would have had any bearing at all on the strength, completeness, or relevance of the government's evidence. Even assuming that the district court's puzzling explanation for excluding the text evidence was error, there is nothing remotely exculpatory about the text message conversation that could have materially benefitted Hinkel. Any error was harmless. See United States v. Shea, 159 F.3d 37, 40 (1st Cir. 1998); United States v. Rose, 104 F.3d 1408, 1414 (1st Cir. 1997).

**C.  Supervised Release**

After serving his ten-year prison sentence--the minimum term of imprisonment for conviction under this statute, see 18 U.S.C. § 2422(b)--Hinkel will be subject to a five-year term of

supervised release.  At Hinkel's sentencing hearing, the district court imposed all of the Special Conditions ("Conditions") of supervised release proposed by the Probation Office in its Presentence Report ("PSR").  Hinkel has preserved objections to four of the thirteen Conditions, excerpted in relevant part below:

> Condition 4: The defendant shall not possess or use a computer or have access to any online service without the prior approval of the Probation Office.

> Condition 7: The defendant is not to use a computer, internet-capable device, or similar electronic device to access child pornography or to communicate with any individual or group for the purpose of promoting sexual relations with children.  The defendant is prohibited from entering chat rooms to send or receive 'instant messages,' or to send or receive email with attached electronic files through any electronic medium unless required for an express class assignment in an accredited educational institution or as an express job requirement for legal, outside employment. The defendant shall not utilize any sex-related adult telephone services, websites, or electronic bulletin boards.

> Condition 9: The defendant shall provide the probation officer with access to any requested financial information for purposes of monitoring their compliance with the imposed computer access/monitoring conditions, including, but not limited to, credit card bills, telephone bills, and cable/satellite television bills.

> Condition 13: The defendant shall be subject to search and seizure of his residence and elsewhere with reasonable suspicion by the Probation Office.

We review preserved challenges to conditions of supervised release for abuse of the sentencing judge's discretion. United States v. Perazza-Mercado, 553 F.3d 65, 69 (1st Cir. 2009). "Although district courts have significant discretion to impose special conditions of supervised release, that discretion is not unlimited." United States v. Medina, 779 F.3d 55, 60 (1st Cir. 2015). A special condition of release may only be imposed if the sentencing court determines that the condition:

> (1) is reasonably related to the factors set forth in [18 U.S.C. § ]3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);
>
> (2) involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in [18 U.S.C. § ]3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and
>
> (3) is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. [§ ]994(a).

18 U.S.C. § 3583(d); see generally Medina, 779 F.3d at 60. The rationale for imposing the condition must also "have adequate evidentiary support in the record." United States v. Roy, 438 F.3d 140, 144 (1st Cir. 2006).

Applying these principles, we find that the first sentence of Condition 4, excerpted above, sweeps too broadly in banning Hinkel from, essentially, all internet access without the

prior approval of his probation officer.[10] This kind of broad-brush, untailored approach to sculpting the conditions of supervised release imposes "a greater deprivation of liberty than is reasonably necessary" to achieve the penal goals Congress has identified. 18 U.S.C. § 3583(2).

We have upheld broad restrictions on internet access as a condition of supervised release "where (1) the defendant used the internet in the underlying offense; (2) the defendant had a history of improperly using the internet to engage in illegal conduct; or (3) particular and identifiable characteristics of the defendant suggested that such a restriction was warranted." Perazza-Mercado, 553 F.3d at 70. Here, Hinkel did use the internet in committing the crime but we are reluctant to rely on that use alone where it is largely collateral to the offense in question, much like how using his truck to arrive to meet "Lisa" and "Samantha" would differ from using his truck to drive recklessly.

As we have previously observed, "[a]n undue restriction on internet use 'renders modern life--in which, for example, the government strongly encourages taxpayers to file their returns electronically, where more and more commerce is conducted on-line, and where vast amounts of government information are communicated

---

[10] Condition 4 also requires that Hinkel cooperate with Probation to install software on his computer to monitor his activities. He does not object to this requirement.

via website--exceptionally difficult.'" Id. at 72 (quoting United States v. Holm, 326 F.3d 872, 878 (7th Cir. 2003)). That observation, made some seven years ago, has only more force today. And it takes no leap of faith to predict that in roughly nine years, when Hinkel is released, internet connectivity is likely to be even closer to a prerequisite to normal functioning in modern society. See generally Riley v. California, 134 S. Ct. 2473, 2484 (2014) (observing two years ago that internet-enabled smart phones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy").

Hinkel's internet usage will also be subject to electronic monitoring per the unobjected-to additional provisions of Condition 4. Given these restrictions, further banning Hinkel from even monitored internet access provides too little benefit to outweigh what we increasingly view as a serious and severe imposition.

Nor do we take solace, as we have in a previous case, in the presence in Condition 4 of a safety valve permitting the defendant to seek approval from the Probation Office and, if necessary, the district court, in order to use the internet for educational or vocational purposes. See United States v. Stergios, 659 F.3d 127, 134 (1st Cir. 2011) ("Should Stergios find [the internet ban] unduly restrictive upon his release, he need only

speak with his supervising officer and, if that does not succeed, raise the issue with the district court."). Stergios, unlike Hinkel, was a "repeat offender" with "a history of improperly using the internet to engage in fraud." Id. at 135. Importantly, Stergios had previously proven himself unable or unwilling to refrain from using a computer to commit fraud while on supervised release following a conviction arising out of a similar use of computers to commit fraud. There is no contention that Hinkel has such a recidivist history or that he has already violated conditions of release. Our obligation to ensure that the special conditions of supervised release work no "greater deprivation of liberty than is reasonably necessary," 18 U.S.C. § 3583(d)(2), to achieve the goals of criminal sentencing, see id. §§ 3583(a)(2)(B)-(D), compels us to vacate the first sentence-- and no more--of Condition 4 of Hinkel's supervised release.

For similar reasons, we also find that the last two sentences of Condition 7 in the excerpt above sweep too broadly and, in the case of the last sentence, too ambiguously. The penultimate sentence suffers from the same defect as we have identified in Condition 4, flatly prohibiting (other than in the course of outside employment or classwork) the use of what have now become standard forms of communicating and associating on essentially all subjects. The last sentence, in turn, expands what would be a reasonable effort to preclude access to sites and

services related to sex with minors, or child pornography, into a ban covering access to all sites that are in any way "sex-related," thereby covering, for example, a large swath of generally accepted modern entertainment, and even news.

In finding the first sentence of Condition 4 unreasonable, we simultaneously sustain as reasonable the first sentence of Condition 7. Forbidding Hinkel from using devices "to access child pornography or to communicate with any individual or group for the purpose of promoting sexual relations with children" speaks closely to the conduct at the heart of the offense Hinkel committed and is reasonably limited to the particular forms of communication that enabled his crime.

Finally, we may briefly dispense with Hinkel's challenge to Conditions 9 and 13. These Conditions essentially act as enforcement subsidies in the government's favor, supporting the Probation Office's efforts to ensure Hinkel's compliance with the conditions limiting his freedom in his first five post-carceral years. While these provisions make it easier for the government to invade his privacy, they are reasonably related to either the Conditions we have approved or the ones Hinkel has not challenged. Without such tools to "mandate compliance," the district court's imposition of special conditions would be "ineffectual." Stergios, 659 F.3d at 134 (quoting United States v. Sebastian, 612 F.3d 47, 52 (1st Cir. 2010)).

### III. Conclusion

Having carefully considered Hinkel's very well briefed and argued challenge, we <u>affirm</u> his conviction and <u>affirm</u> his sentence, with the exception of the first sentence of Condition 4 and the last two sentences of Condition 7 governing the terms of his supervised release, each of which we <u>vacate</u>.