**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2297
_____

UNITED STATES OF AMERICA

v.

JUSTIN DANIEL LOUGH,
a/k/a Justin Lough
a/k/a Rocko,
                                    Appellant

_____

On appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Crim. No. 4-17-cr-00139-004)
District Judge: Honorable Matthew W. Brann

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
June 2, 2021

Before: HARDIMAN, PHIPPS, and COWEN, *Circuit Judges*.

Filed: November 19, 2021

_____

OPINION*

_____

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

PHIPPS, *Circuit Judge*.

This case involves a challenge to a denial of a motion to dismiss an indictment. A federal grand jury in Williamsport, Pennsylvania returned a multi-count indictment against Justin Lough for his role in an interstate drug- and gun-trafficking operation. Lough was a member of a white supremacist group, Aryan Strikeforce, or ASF, and he moved to dismiss the indictment, arguing that federal agents engaged in outrageous government conduct in their efforts to induce ASF members to commit crimes. The District Court denied Lough's motion. And after he pled guilty to conspiracy to distribute 500 grams or more of methamphetamine, *see* 21 U.S.C. § 846, but preserved his ability to appeal the denial of that motion, the District Court sentenced him to a prison term of 144 months. In reviewing the District Court's denial of the motion to dismiss for clear error as to factual findings and *de novo* as to legal conclusions, *see United States v. Stock*, 728 F.3d 287, 291 (3d Cir. 2013), we will affirm the judgment of the District Court for the reasons below.

I.

In the summer of 2016, agents with the Federal Bureau of Investigation began investigating complaints that ASF had interests in acquiring firearms for tactical training and in building an improvised explosive device. As part of that investigation, an undercover agent discovered that ASF was looking to form a "service unit" consisting of a small group of elite members committed to conducting criminal or violent operations. Hrg. Tr. at 34:14–25, 133:1–6 (Dec. 10, 2018) (JA117). In meeting with the proposed

2

members of the service unit, which included Lough, the undercover agent learned that although they were interested in buying firearms, they could not afford them.

Based on that information, the undercover agent presented Lough and other service-unit members with a "business opportunity," which, in reality, was a simulated crime. Gov't Ex. 2.1 at 1 (Nov. 21, 2016) (JA447). He offered them money if they would provide security for his transportation of an unknown package. The undercover agent also provided them with information about a potential firearms deal, again simulated, which would require a deposit in the form of prepaid credit cards. In offering the service-unit members these opportunities, the undercover agent explained the possibility of imprisonment and made clear that they did not need to participate. In response, Lough offered to serve as the driver and to use his own vehicle for the transport.

Lough and the other ASF members then met the undercover agent to carry out the transport. Although they were actually moving simulated crystal methamphetamine, the undercover agent told them that they were transporting methamphetamine, to which Lough responded, "I think I want some of your crystal." Gov't Ex. 3.2.1 at 1 (Dec. 4, 2016) (JA462). When they arrived at their destination, the group met another undercover agent, who gave them cash as well as an option to buy gift cards to make a down payment on firearms.

After that successful run, the first undercover agent contacted the service-unit members about providing security for additional transports. Lough and other ASF members then completed a second run, this time across state lines, again with simulated

3

methamphetamine. They went on to complete two more interstate transports – one with simulated methamphetamine and the other with both the simulated drugs and firearm parts. After each of the three interstate transports, the ASF members used the cash they received to purchase gift cards to make the down payment on firearms. Throughout the operation, the undercover agents gave Lough and the other members the option to back out and reminded them that the transports were illegal. But Lough expressed a particular interest in the activities and remarked that he would always want to assist with the transports. He even began asking about extra opportunities to do "side work." Gov't Ex. 4.5 at 3–7 (JA492–96).

By the fourth run, the FBI had seen enough. Some ASF members had been recounting their recent violent altercations, including a fight with brass knuckles and an attempted execution-style murder. Alarmed at this violence, the FBI arrested Lough and other ASF members, all of whom were later charged.

The indictment included several counts against Lough for violating federal law. *See* 18 U.S.C. § 3231 ("The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."). Those charges consisted of one count of conspiracy, *see* 18 U.S.C. § 371, three counts of interstate travel in aid of racketeering enterprises, *see id.* § 1952(a)(3), one count of conspiracy to distribute a controlled substance, *see* 21 U.S.C. § 846, three counts of attempted distribution of a controlled substance, *see id.*, one count of conspiracy to commit money laundering, *see* 18 U.S.C. § 1956(h), three counts of

money laundering, *see id.* § 1956(a)(3)(B), and one count of transport, delivery, and receipt of unregistered machine guns, *see* 26 U.S.C. § 5861(j).

Lough moved to dismiss the indictment, arguing that the FBI had engaged in outrageous government conduct by its efforts in concocting a fake criminal enterprise with an array of false crimes for him to commit. After the District Court denied that motion, Lough conditionally pled guilty to conspiracy to distribute 500 grams or more of methamphetamine while reserving the right to appeal the District Court's denial of his motion. Lough timely appealed, bringing his challenge to the indictment on outrageous-government-conduct grounds within this Court's appellate jurisdiction. *See* 28 U.S.C. § 1291.

## II.

The legal viability of the outrageous-government-conduct defense "is hanging by a thread." *United States v. Nolan-Cooper*, 155 F.3d 221, 230 (3d Cir. 1998). This Court has applied the defense only once – more than forty years ago – in a case where outrageous government conduct functioned as an enhanced entrapment defense. In that case, *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), entrapment was not available because one defendant had a predisposition to the criminal activity and the other defendant was not brought into the criminal enterprise by a government agent. *See id.* at 376 ("It should be made clear from the outset that our reversal is not based on the entrapment defense . . . [because] [b]y convicting the defendants, the jury rejected the entrapment defense."). Still, this Court determined that "the nature and extent of police involvement . . . was so overreaching as to bar prosecution of the defendants as a matter

5

of due process of law." *Id.* at 377. Thus, the rule from *Twigg* is that "although proof of predisposition to commit the crime will bar application of the entrapment defense, fundamental fairness will not permit any defendant to be convicted of a crime in which police conduct was 'outrageous.'" *Id.* at 378–79.

Despite the defense's availability for governmental involvement in criminal activities that reach a "demonstrable level of outrageousness," this Circuit has not applied the defense since *Twigg*. *Id.* at 378 (quoting *Hampton v. United States*, 425 U.S. 484, 495 n.7 (1976) (Powell, J., concurring)). Rather, this Court has repeatedly rejected the defense "with almost monotonous regularity," emphasizing that the defense applies to "*only the most intolerable government conduct*." *United States v. Voigt*, 89 F.3d 1050, 1065 (3d Cir. 1996) (citations omitted) (emphasis in original).

Like the defendants in *Twigg*, Lough seeks to avail himself of the outrageous-government-conduct defense as an enhanced entrapment defense. Perhaps because he does not dispute his criminal predisposition, Lough did not raise the entrapment defense. Instead, he argues that FBI agents went too far in concocting a simulated criminal enterprise to convict him. The outrageous-government-conduct defense is one of degree, and the FBI agents' actions were not "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Hampton v. United States*, 425 U.S. 484, 489 (1976) (quoting *United States v. Russell*, 411 U.S. 423, 431–32 (1973)).

Nothing about the government's conduct reached a demonstrable level of outrageousness. Federal agents learned about Lough as part of their investigation of

6

complaints against the Aryan Strikeforce. Although those complaints did not concern Lough directly, as undercover agents gained more information about ASF, they discovered that it had a service unit, which sought to engage in criminal or violent conduct, and that Lough was a member of that unit. That was not outrageous government conduct – even *Twigg* recognized that "[i]nfiltration of criminal operations by informers and undercover agents is an accepted and necessary practice." 588 F.2d at 380.

Nor was it outrageous for the government to create simulated crimes designed to attract members of the ASF service unit. Use of a simulated crime is a common, permissible tactic for law enforcement.[1] The legality of that technique has been upheld in

---

[1] *See, e.g.*, *United States v. Barbosa*, 271 F.3d 438, 469 (3d Cir. 2001) ("In fighting this 'war on drugs,' law enforcement personnel have needed to develop a number of sophisticated and covert investigatory techniques. One of these techniques involves the creation of what appear to be authentic drug transactions, oftentimes with the joint participation of both law enforcement personnel (or their designees) and the targets of the investigation. Such subterfuge is a well recognized and permissible means of investigation."); *United States v. Martino*, 825 F.2d 754, 763 (3d Cir. 1987) ("In the pursuit of crime the Government is not confined to behavior suitable for the drawing room. It may use decoys and provide the essential tools of the offense. The creation of opportunities for crime is nasty but necessary business." (quoting *United States v. Murphy*, 768 F.2d 1518, 1529 (7th Cir. 1985))).

a variety of contexts, including controlled-buy operations,[2] undercover sex-crime sting investigations,[3] drug-trafficking stings,[4] and bribery investigations.[5]

Likewise, it was not outrageous for the government to attract Lough to simulated criminal activities in which he had an interest. At an early point, he told federal agents that he would always be interested in working on the transports. He also willingly engaged in those acts, refused to back out when given multiple opportunities, and requested to work on other such jobs on the side.

Thus, from start to finish, the government's conduct did not offend the 'so outrageous' standard, and we will affirm the judgment of the District Court.

---

[2] *See United States v. Sed*, 601 F.3d 224, 231 (3d Cir. 2010) (upholding a conviction and sentence from a controlled purchase); *United States v. Jarmon*, 14 F.4th 268, 274–75 (3d Cir. 2021) (same); *see also United States v. Beltran*, 571 F.3d 1013, 1020 (10th Cir. 2009) (upholding a sentence from a controlled purchase conviction); *United States v. Torres*, 563 F.3d 731, 736 (8th Cir. 2009) (same); *United States v. Fanfan*, 468 F.3d 7, 16 (1st Cir. 2006) (upholding a conviction and sentence from a controlled purchase).

[3] *See United States v. Davis*, 985 F.3d 298, 306–308 (3d Cir. 2021) (upholding a conviction in a sting operation trying to catch adults seeking sex with minors); *see also United States v. Fortner*, 943 F.3d 1007, 1011 (6th Cir. 2019) (similar); *United States v. Cooper*, 926 F.3d 718, 729, 741 (11th Cir. 2019) (similar); *United States v. Hinkel*, 837 F.3d 111, 120 (1st Cir. 2016) (similar); *United States v. Howard*, 766 F.3d 414, 415–16, 428 (5th Cir. 2014) (similar); *United States v. McIlrath*, 512 F.3d 421, 422–23 (7th Cir. 2008) (similar).

[4] *See Barbosa*, 271 F.3d at 472 (3d Cir. 2001) (upholding a conviction after the government solicited the defendant to travel internationally, swallow drugs, and return); *United States v. Ward*, 793 F.2d 551, 555 (3d Cir. 1986) (involving government participation in a smuggling scheme).

[5] *See United States v. Jannotti*, 673 F.2d 578, 610 (3d Cir. 1982).