# United States Court of Appeals
## For the First Circuit

No. 19-1538

UNITED STATES OF AMERICA,

Appellee,

v.

RAFAEL PÉREZ-RODRÍGUEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Pedro A. Delgado-Hernández, U.S. District Judge]

Before

Kayatta, Lipez, and Barron, Circuit Judges.

Linda A. Backiel for appellant.
Julia Meconiates, Assistant United States Attorney, with whom
W. Stephen Muldrow, United States Attorney, and Mariana E. Bauzá-
Almonte, Assistant United States Attorney, were on brief, for
appellee.

September 2, 2021

**LIPEZ**, **Circuit Judge**.    Rafael Pérez-Rodríguez was convicted by a jury of attempted enticement of a minor for unlawful sexual activity in violation of 18 U.S.C. § 2422(b).  He was apprehended through a sting operation in which a government agent created a profile on an adults-only dating application posing as a gay adult man, and, after being contacted by Pérez, then offered to arrange a sexual encounter with his minor "boyfriend."  Pérez appeals on several grounds, including insufficiency of the evidence and the denial of a jury instruction on the entrapment defense.  While we find Pérez's challenge to the sufficiency of the evidence meritless, we conclude that the district court committed plain error in failing to give the entrapment instruction.  We therefore vacate the conviction and remand for a new trial.

## I.

In 2015, Ryan Seig, a special agent with the child exploitation unit of Homeland Security Investigations ("HSI"), conducted a sting operation using the geosocial networking application Grindr.  Agent Seig testified that the purpose of the application is "to talk and usually meet with someone else who shares your interests."  On cross-examination, he added "it's social networking among homosexuals."  Grindr describes itself as "the largest social networking app for gay, bi, trans, and queer people."  About, Grindr, https://www.grindr.com/about/ (last

visited August 25, 2021).  Grindr allows users to create profiles and to exchange messages with other users with profiles in their geographic area.  Per Agent Seig's testimony, "[a] profile is a small blurb about what you are looking for, possibly what you look like, and sort of a general description of who you are and what you want."  Grindr requires users to be eighteen years of age or older and does not allow individuals to use the platform to seek sexual encounters with minors.

Agent Seig created a Grindr profile under the name "Dave W."  He wrote in his profile, "Looking for young fun or to share my young fun."  He testified that he chose this text as a "veiled" reference to a sexual encounter with a minor, explaining that "someone who was familiar with the way pedophiles communicate on the internet could read this and know what it meant."  The profile also described "Dave W." as "Muscular, White, Single."

On December 30, 2015, the Dave undercover profile received a message from a profile with the name "Mirando," a profile created by Pérez.  Dave and "Mirando" exchanged messages on Grindr, and then moved to text messaging.  The precise language of the messages is crucial to this case.[1]  Thus, we reproduce key parts of the exchange in full.  The conversation began as follows:

---

[1] The messages were primarily in Spanish.  We draw from the certified English translations that were admitted into evidence.

- 3 -

Pérez: Hello what are you doing?

Dave: Hey what's up

Pérez: Let's see you

Dave: Cool, do you like really young guys?

Pérez: Yes
       Age?
       I started at 8

Dave: Me? 35, but my boyfriend is young

Pérez: Hahhaha Okk
       How old is he?
       What does your boyfriend like?

Dave: He likes everything :)
      He is very young, what age do you like?

Pérez: The younger the better
       I don't discriminate
       I started at 8 hehehhe
       So you tell me
       What does he like to do?
       We are close, we can come up with some fun
       From there up I do it all

Dave: Do you understand English? I speak only a little
      Spanish
      My boyfriend is 11 years old.  Do you want to play
      with him?

Pérez: Mmmm yessss
       Where is he?
       I speak little only a little English?
       Share pics??
       You tell me when and where???
       Do you prefer to call?
       Yes, I want to play

Dave:  We live in[] San Juan.
       We're free next week.

          Pérez: Ok
                 Have whatsapp?
                 Send me pics?
                 Can you now?

          Dave: Yes I'm busy with a party

          Pérez: Ok, but you are close
                 Can you get away?
                 Can you*

          Dave: Last night, no haha :)
                Do you want anal with him or oral?

          Pérez: Everything
                 I want the 3 of us to play
                 You for a while and me for a while.  You like?

          Dave:  Me too
                 Yes

          Pérez: Send me something to see you playing with him
                 I like taboo

          Dave:  Me too :)

          Pérez: Have a pic?
                 Are you with him at the party

          Dave: I don't want to send a pic because I won't know
                who you are until we meet
                Yes, he is here
                You can take pics if this happens.  Just no faces
                I don't have whatsapp
                But I can text

          Pérez: Text is better

Pérez then sent two photos of himself to "Dave," and Dave provided

Pérez with a telephone number.

     The next day, December 31, Pérez sent Dave a text message

to continue the conversation.  He again expressed sexual interest

in "Dave's" minor "boyfriend."  Dave messaged, "we're going to

have a lot of fun, friend. :) . . . Him you and I[.]" Pérez requested pictures of "Dave." Pérez asked Dave questions about his relationship with the minor. ("How did you get him?" and "How long have you had him?").

On January 1, Pérez messaged Dave and said, "Happy New Year." He again said, "I want your boyfriend." Pérez and Dave discussed their availability for a meeting that week. They exchanged messages about what Pérez wants to do during the sexual encounter. Pérez asked several questions about how Dave met the minor, what the minor's parents think, and whether "Dave's" family knows about the minor. "Dave's" answers included "He's my friend" and "I am a 'good influence.'"

On January 2, Dave initiated the conversation. He writes, "Just saying hi. Very busy with family! Happy new year ;)[.]" The following day, Dave and Pérez discussed meeting.

Pérez: Let's see each other tomorrow to get to know you

Dave: Ok, what time can you do it?

Pérez: Write me when you wake up
       I get up early
       Where should we meet?

Dave: Are we using your house or mine for the threesome?

Pérez: Yes. I live alone. But if it's at home, then it
       should be in the afternoon
       But I want to see you before to get to know you
       and see what you want to do so that I'm
       comfortable

Dave: I understand. Me too.

        Pérez: Ok

        Dave: Where is a good place for us all to meet?

        Pérez: Where should we meet

        Dave: We can meet and then go to your house for sex with
              all of us?
              I can meet anywhere.  It doesn't matter.  We'll
              talk in the morning when you know more concerning
              your schedule

        Pérez: Yes
               Depends on what we talk about and we'll go
               I am free.  Write to me tomorrow.

Pérez then requested a picture of Dave again.  He asked Dave

several more questions about his relationship with the minor.  Dave

said that the minor is "excited, happy" about the planned sexual

encounter.  They agreed to meet at Guaynabo Plaza.  Pérez stated

"first I see you" and asked "Can you come alone?"  Dave replied,

"I can leave him at my place and you can follow me there, ok?"

Pérez responded, "Yes."

        The following morning, Monday, January 4, Dave started

the conversation again, initiating this exchange:

        Dave: Can you meet at 3?

        Pérez: Ok

        Dave: Cool

        Pérez: Ok

        Dave: I spoke with him and he's excited :)
              He's worrie[d] about what clothes to bring
              LOL
              What parking do you want to meet in?
              Are you busy?

Pérez: Hahahhahha
       Go to Guaynabo Plaza and I'll tell you where
       we'll meet
       Remember that I want to talk to you first.  I
       need to feel safe.

Dave: Yes, me too, it's a good idea.
      I am also scared.

Pérez: That's why I want to see you by yourself.
       I would like to know you first.

Dave: Yes, he will be at my house

Pérez: Ok

Dave: Waiting with the XBOX and beers LOL

Pérez: What are you like, physically?
       Mmmmm
       I like beer
       He doesn't get in trouble for drinking?

Dave: Like in my profile.
      5'9" or 5'10".  Brown hair.

Pérez: Gym body?

Dave: Yes, I lift weights 4-5 days a week
      I am not fat

Pérez: And what's he like?

Dave: Skinny, like a young guy.  He is Boricua, with
      short hair.

Pérez: Ok

Dave: He likes soccer jerseys?
      He's very intelligent and friendly

Pérez: Let's see one another now to talk and be horny
       about what we're going to do.

The two men eventually agreed to meet at the Martinez Nadal train station at 4 p.m.

At the appointed time, Agent Seig drove to the station and parked his vehicle in the parking lot. Seig had informed other members of his unit about the meeting, and several additional HSI agents were also waiting in the parking lot. Pérez drove into the parking lot, pulled up alongside Agent Seig's vehicle, and got out of his car. HSI agents immediately arrested him.

On January 27, 2016, a grand jury returned an indictment charging Pérez with one count of attempted enticement of a minor in violation of 18 U.S.C. § 2422(b). Prior to commencement of the jury trial, the parties submitted proposed jury instructions. Pérez filed a separate ex parte request for an entrapment jury instruction.

A two-day jury trial was held beginning on May 15, 2017. The government's case primarily consisted of Agent Seig's testimony and the transcripts of the Grindr and text messages.[2] Pérez did not present any witnesses.[3] At the close of the evidence,

_____

[2] The government also presented testimony from two other HSI agents present at the arrest. An AT&T security manager also explained how he confirmed that the phone which sent the messages belonged to Pérez.

[3] Pérez attempted to present character witnesses, but the court excluded the testimony as impermissible under the Federal Rules of Evidence because there was no pertinent character trait associated with the crime charged.

Pérez moved for acquittal under Rule 29. The district court denied the motion. The parties participated in a charging conference, which was not recorded. Nevertheless, the record indicates that Pérez renewed his request for an entrapment jury instruction at that conference because the district court denied the entrapment instruction in a docket entry, stating, "The ruling is based on the arguments presented by the government and defendant's response during the charging conference in connection with predisposition. In the end, the evidence presented at trial did not justify an entrapment instruction." Before instructing the jury, the court asked the parties if there were "any objections to the instructions." Pérez did not raise any objections at that time. After charging the jury, the district court did not invite objections from the parties. Pérez did not raise any objection. The jury deliberated for less than one hour and returned a guilty verdict. On May 14, 2019, Pérez was sentenced to 151 months of incarceration.

Pérez timely filed this appeal. In addition to challenging the sufficiency of the evidence, he asserts that the district court erred in rejecting his request for an entrapment instruction.[4]

---

[4] Pérez raises four additional claims of error: (1) inadequate questioning during voir dire, (2) violations of the Jones Act, see 48 U.S.C. § 864 (requiring that all trial proceedings in the

- 10 -

We review de novo the district court's denial of Pérez's properly preserved claim that the evidence presented at trial was insufficient to support the jury's verdict. See United States v. Tanco-Baez, 942 F.3d 7, 15 (1st Cir. 2019). In evaluating a sufficiency of the evidence claim, "we examine the evidence, both direct and circumstantial, in the light most favorable to the prosecution and decide whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged count or crime." United States v. Velázquez-Aponte, 940 F.3d 785, 798 (1st Cir. 2019) (quoting United States v. Díaz-Rosado, 857 F.3d 116, 120-21 (1st Cir. 2017)).

## A. The Elements of the Offense

Pérez was found guilty of violating 18 U.S.C. § 2422(b), which provides:

> Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18

District of Puerto Rico be conducted in English), and the Court Reporter Act, see 28 U.S.C. § 753(b) (requiring federal court proceedings to be recorded verbatim), (3) improper opinion testimony, and (4) improper exclusion of a character witness. Except for some observations on the voir dire process, we do not address the other issues raised given our conclusion that Pérez's conviction must be vacated on the basis of the court's failure to give an entrapment instruction.

years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.

To support a conviction under the attempt portion of the statute, the government must show that the defendant attempted to "(1) use a facility of interstate commerce (2) to knowingly persuade, induce, entice, or coerce (3) an individual under the age of 18 (4) to engage in illegal sexual activity."[5] United States v. Berk, 652 F.3d 132, 138 (1st Cir. 2011) (quoting United States v. Gravenhorst, 190 F. App'x 1, 3 (1st Cir. 2006) (per curiam)).

To prove an attempt, the government must establish both a specific intent to commit the substantive offense and a substantial step toward its commission. Id. at 140. Hence, for conviction under § 2422, the specific intent required is the intent to persuade, induce, entice, or coerce a minor into engaging in illegal sexual activity. We have interpreted this requirement as broadly requiring an intent "to achieve a mental state -- a minor's assent -- regardless of the accused's intentions vis-à-vis the actual consummation of sexual activities with the minor." United States v. Dwinells, 508 F.3d 63, 71 (1st Cir. 2007) (emphasis omitted).

---

[5] Here, the government argued, the illegal sexual activity was sexual assault under Puerto Rico law. See P.R. Laws Ann. tit. 33, § 5191(a) (defining sexual assault to include sex with someone under age sixteen).

A substantial step toward commission of an offense is "less than what is necessary to complete the substantive crime, but more than 'mere preparation.'" Berk, 652 F.3d at 140 (quoting United States v. Piesak, 521 F.3d 41, 44 (1st Cir. 2008)). This requirement serves to "distinguish between those who express criminal aims without doing much to act on them and others who have proved themselves dangerous by taking a substantial step down a path of conduct reasonably calculated to end in the substantive offense." United States v. Doyon, 194 F.3d 207, 211 (1st Cir. 1999). We have found that a variety of actions, including actions short of meeting the minor in person, can constitute a substantial step toward a § 2422(b) offense. See United States v. Rang, 919 F.3d 113, 121 (1st Cir. 2019) (defendant reserved hotel room and sought consent from the minor's mother for a "sleepover" with the minor); Berk, 652 F.3d at 140 (defendant offered to help a woman find housing in exchange for sex with her daughter and sent the woman leads about homes for rent); Gravenhorst, 190 F. App'x at 4 (defendant sent minors sexually explicit messages and proposed meeting in person). But see Berk, 652 F.3d at 140-41 (noting that "explicit sexual talk alone" does not constitute a substantial step toward a § 2422(b) offense (citing United States v. Gladish, 536 F.3d 646, 652 (7th Cir. 2008))). Direct communication with a minor, real or fictitious, is not required. A person can commit a § 2422(b) offense by communicating with an adult who acts as an

"intermediary" between the defendant and a minor.  See Berk, 652 F.3d at 140.

## B. The Sufficiency of the Evidence Against Pérez

On the first element, intent, Pérez argues that the government failed to provide enough evidence to allow a jury to conclude that he intended to persuade, induce, entice, or coerce a minor.  He asserts: "There was no reason to do that [i.e., persuade, induce, entice, or coerce] here because the agent offered [a minor] he presented as already ready, willing, and experienced, 'lik[ing] everything.'"  In his view, the evidence, at most, could allow the jury to conclude that Pérez communicated with an adult with the intention of "bringing about a meeting at which prohibited conduct was supposed to, or likely to occur."

Pérez's focus on the fictitious minor's supposed sexual experience and willing participation is seriously misplaced.  A child who has previously been sexually abused or is otherwise depicted as "experienced" can still be a victim of persuasion, inducement, enticement, or coercion.  See United States v. Hinkel, 837 F.3d 111, 116 (1st Cir. 2016) (upholding a § 2422(b) conviction where the minor was described as "15 but experienced").  And a child's expression that he "like[s] it" and wants to engage in illegal sexual activity does not mean that persuasion, inducement, enticement, or coercion could not possibly play a role.  See Dwinells, 508 F.3d at 67 (upholding a § 2422(b) conviction where

- 14 -

law enforcement agents posing as minors responded positively to the defendant's sexual advances, including one fictitious minor who "assured him that she would consent" to sexual activity in person). To suggest otherwise is to misunderstand the nature of child sexual abuse. See United States v. Gonyer, 761 F.3d 157, 167 (1st Cir. 2014) (describing the process of a sexual predator "grooming" a child to form an emotional connection which would lead the child to be persuaded to engage in sexual activity); United States v. Brand, 467 F.3d 179, 203 (2d Cir. 2006) ("Child sexual abuse is often effectuated following a period of 'grooming' and the sexualization of the relationship." (quoting Sana Loue, Legal and Epidemiological Aspects of Child Maltreatment, 19 J. Legal Med. 471, 479 (1998))).

It was reasonable for the jury to believe that the fictitious eleven-year-old boy Dave "offered" to Pérez would not participate in the planned sexual encounter absent persuasion, inducement, coercion, or enticement -- at a minimum, "implicit coaxing or encouragement." See United States v. Montijo-Maysonet, 974 F.3d 34, 42 (1st Cir. 2020) ("[T]he four verbs Congress used -- including 'entice' and 'induce' -- plainly reach implicit coaxing or encouragement designed to 'achieve . . . the minor's assent' to unlawful sex[.]" (second omission in original) (quoting Dwinells, 508 F.3d at 71)). And it was reasonable for the jury to conclude that Pérez must have been cognizant of that reality and

- 15 -

was relying on Dave to affect his "boyfriend's" mental state such that the minor would participate. Although Agent Seig's text messages can be read to imply that Dave had already groomed the minor for the sexual activity, the jury could reasonably infer that Pérez intended to use Dave as an intermediary to "entice" (meaning "to draw on by arousing hope or desire: allure, attract," id.) the minor into participating in illegal sexual activity with Pérez on January 4, 2016.

On the second element, substantial step, Pérez emphasizes that he never communicated directly with a minor. Such communication is not required to establish a substantial step towards commission of a § 2422(b) offense. In Berk, we recognized that "a defendant can be convicted [of a § 2422(b) offense] even if the relevant communications are with an intermediary." 652 F.3d at 140. Berk involved communications between the defendant and parents of minor children, but we did not state that only parents could serve as intermediaries in the commission of a § 2422(b) offense. See id. Indeed, the rationale for relying on a sexual predator's use of intermediaries extends to any adult with sufficient influence or control over a minor. As explained by the Third Circuit, in an opinion cited in Berk, § 2422(b) is "part of an overall policy to aggressively combat computer-related sex crimes against children[] [and] [i]t would be wholly inconsistent with the purpose and policy of the statute to allow

sexual predators to use adult intermediaries to shield themselves from prosecution."  United States v. Nestor, 574 F.3d 159, 162 (3d Cir. 2009); see also Montijo-Maysonet, 974 F.3d at 42 ("Congress . . . meant to cast a broad net (consistent with the Constitution) to catch predators who use the Internet to lure children into sexual encounters." (citing H.R. Rep. 105-557, at 21 (1998), as reprinted in 1998 U.S.C.C.A.N. 678, 678-79)).

The "broad net" plainly must cover a defendant who attempted to use any intermediary adult perceived to have sufficient sway to "lead a child to participate in sexual activity."  See United States v. Douglas, 626 F.3d 161, 164 (2d Cir. 2010).  The defendant's understanding of the nature and degree of the adult's control over the minor is a question of fact for the jury.  Here, the jury could reasonably infer that an adult man whose "boyfriend" is a minor, and who confidently invites another man to have sex with the child, would have been viewed by the defendant as  someone with the power  to elicit the minor's assent to illegal sexual activity.[6]

Pérez similarly argues a lack of evidence of a substantial step because the evidence showed he arrived at the

---

[6] Pérez mischaracterizes the evidence by describing Dave as "a part-time tutor" to the minor.  While Dave did mention that the minor was his student, he more importantly described him as his "boyfriend" and a person with whom he had an ongoing sexual relationship for six months.

parking lot to meet Dave, not the minor.  We agree with the district court that "the act of traveling to meet an intermediary . . . has been held sufficient to establish a 'substantial step.'"  United States v. Pérez-Rodríguez, No. 16-041 2016, WL 7442650, at *2 (D.P.R. Dec. 27, 2016) (citing Berk, 652 F.3d at 140).  Drawing all inferences in favor of the government, a rational jury could find that Pérez's communications with Dave and his subsequent arrival at the meeting he arranged with Dave constituted a substantial step to persuade, induce, entice, or coerce a minor. Thus, there was sufficient evidence to convict and the motion for acquittal was properly denied.

## III.

The district court declined to instruct the jury as to the elements of Pérez's primary defense, entrapment, because, in its view, the record did not contain sufficient evidence to warrant the instruction.  Pérez argues that this omission denied him a fair trial.

**A. Standard of Review**

Preserved objections to the denial of a requested jury instruction are subject to plenary review.  United States v. Joost, 92 F.3d 7, 12 (1st Cir. 1996).  If, however, the defendant fails to preserve his claim of entitlement to a jury instruction, the claim is forfeited, and we review the district court's decision under the plain error standard of Rule 52(b) of the Federal Rules

of Criminal Procedure. United States v. Baltas, 236 F.3d 27, 36 (1st Cir. 2001). It has been the longstanding rule of this circuit to treat a challenge to jury instructions as forfeited if the defendant fails to object to the instructions after the judge has charged the jury, regardless of whether he previously brought the matter to the judge's attention. United States v. Wilkinson, 926 F.2d 22, 26 (1st Cir. 1991) ("As we have repeatedly held, . . . [a] party may not claim error in the judge's charge to the jury unless that party 'objects' after the judge gives the charge but before the 'jury retires . . . .'" (quoting Fed. R. Crim. P. 30)), overruled on other grounds by Bailey v. United States, 516 U.S. 137, 149 (1995). Though Pérez requested an entrapment instruction before the trial and argued for it at a charging conference, he did not lodge a post-charge objection to the denial of the instruction.[7] Thus, Pérez's claim is subject to plain error review.

To meet the heavy burden of establishing plain error, an appellant must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness,

---

[7] Pérez also failed to make an objection when the judge invited objections on the record directly before instructing the jury. Even if Pérez had made such an objection, his claim would still be subject to plain error review under our precedent because he did not renew it after the instruction, and we hold parties strictly to that timing. See Wilkinson, 926 F.2d at 26.

integrity, or public reputation of judicial proceedings." <u>United States</u> v. <u>Duarte</u>, 246 F.3d 56, 60 (1st Cir. 2001). The first prong, "error," consists of "[d]eviation from a legal rule." <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 732-33 (1993). The second prong requires that the error identified in the first prong is not "open to doubt or question," though an appellant can meet this requirement even in the "absence of a decision directly on point." <u>United States</u> v. <u>Morales</u>, 801 F.3d 1, 10 (1st Cir. 2015).[8] To establish the third prong, the appellant must show that "it is reasonably probable that the . . . error affected the result of the proceedings." <u>United States</u> v. <u>Latorre-Cacho</u>, 874 F.3d 299, 303 (1st Cir. 2017). Our analysis under the fourth prong is guided by our fundamental concern with "the public legitimacy of our justice system[,] [which] relies on procedures that are 'neutral, accurate, consistent, trustworthy, and fair.'" <u>Rosales-Mireles</u> v. <u>United States</u>, 138 S. Ct. 1897, 1908 (2018) (quoting Josh Bowers & Paul H. Robinson, <u>Perceptions of Fairness and</u>

---

[8] We note that, in our circuit, the second prong is sometimes described as "clear and obvious error," <u>e.g.</u>, <u>United States</u> v. <u>Scott</u>, 877 F.3d 42, 49 (1st Cir. 2017), while in other opinions it is phrased as "clear or obvious error," <u>e.g.</u>, <u>United States</u> v. <u>Aquino-Florenciani</u>, 894 F.3d 4, 7 (1st Cir. 2018). As far as we can tell, there is no substantive difference between the two usages. In fact, we are unaware of any decision suggesting that the words "clear" and "obvious" have different meanings. We will use the "clear or obvious" formulation here, which appears to be the more frequent usage.

_Justice: The Shared Aims and Occasional Conflicts of Legitimacy and Moral Credibility_, 47 Wake Forest L. Rev. 211, 215-16 (2012)).

The plain error standard is a difficult burden for any appellant to meet. See United States v. Gelin, 712 F.3d 612, 620 (1st Cir. 2013) ("This multi-factor analysis makes the road to success under the plain error standard rather steep; hence, reversal constitutes a remedy that is granted sparingly."). It is a particularly challenging standard to meet in the context of an unpreserved objection to jury instructions. See United States v. Paniagua-Ramos, 251 F.3d 242, 246 (1st Cir. 2001) ("[T]he plain error hurdle, high in all events, nowhere looms larger than in the context of alleged instructional errors."). Nonetheless, on rare occasions, the severity of an error in instructing the jury does rise to the level of plain error and requires vacatur of the conviction. See, e.g., Latorre-Cacho, 874 F.3d at 310; United States v. Delgado-Marrero, 744 F.3d 167, 189 (1st Cir. 2014).

## B. The Entrapment Defense

Entrapment provides a defense if law enforcement officers "originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." Jacobson v. United States, 503 U.S. 540, 548 (1992); see United States v. Teleguz, 492 F.3d 80, 84 (1st Cir. 2007) ("Congress could not have intended that its statutes were to be

enforced by tempting innocent persons into violations." (quoting Sherman v. United States, 356 U.S. 369, 372 (1958)).  The defense has two prongs: (1) improper government inducement and (2) the defendant's lack of predisposition to commit the offense charged. Id.

### 1. Improper Inducement

Improper inducement, also referred to as "government overreaching," occurs when law enforcement agents engage in conduct "of the type that would cause a person not otherwise predisposed to commit a crime to do so."  Hinkel, 837 F.3d at 117. The mere creation of an "opportunity to commit a crime" through a "sting" operation does not, in and of itself, constitute improper inducement.  United States v. Gendron, 18 F.3d 955, 961 (1st Cir. 1994) (quoting Jacobson, 503 U.S. at 550).  Rather, "[a]n 'inducement' consists of an 'opportunity' plus something else -- typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive."  Id.  "Plus" factors that may tip a government operation from a permissible sting operation to improper inducement include, for example, intimidation and threats, "dogged insistence," playing on the defendant's sympathies, and "repeated suggestions."  Id. (collecting cases). "[E]ven very subtle governmental pressure, if skillfully applied, can amount to inducement."  United States v. Poehlman, 217 F.3d

- 22 -

692, 701 (9th Cir. 2000). The judgment of whether government conduct has crossed the line from valid law enforcement tactic to improper inducement is often a difficult factfinding question for the jury because "the facts [may] fall somewhere in a middle ground between what is plainly proper and what is plainly improper." United States v. Acosta, 67 F.3d 334, 338 (1st Cir. 1995); see also id. ("To assume that we are dealing with a sharp boundary rather than a spectrum is an illusion.").

## 2. Lack of Predisposition

The second element of the entrapment defense turns on whether the "defendant was disposed to commit the criminal act prior to first being approached by Government agents." Jacobson, 503 U.S. at 549. Our decision in Gendron sets forth our understanding of this element as follows:

> The right way to ask the question, it seems to us, is to abstract from -- to assume away -- the present circumstances insofar as they reveal government overreaching. That is to say, we should ask how the defendant likely would have reacted to an ordinary opportunity to commit the crime. By using the word "ordinary," we mean an opportunity that lacked those special features of the government's conduct that made of it an "inducement," or an "overreaching." Was the defendant "predisposed" to respond affirmatively to a proper, not to an improper, lure?

Gendron, 18 F.3d at 962 (citation omitted). The purpose of this predisposition inquiry is to determine whether the defendant is "someone who would likely commit the crime under the circumstances

- 23 -

and for the reasons normally associated with that crime, and who therefore poses the sort of threat to society that the statute seeks to control, and which the government, through the 'sting,' seeks to stop." Id. at 963. The "critical time" for the predisposition analysis is the time "in advance of the government's initial intervention." United States v. Gifford, 17 F.3d 462, 469 (1st Cir. 1994); see also United States v. Gamache, 156 F.3d 1, 12 (1st Cir. 1998) ("[T]he concept of predisposition has a definite temporal reference: 'the inquiry must focus on a defendant's predisposition before contact with government officers or agents.'" (quoting United States v. Brown, 43 F.3d 618, 627 (11th Cir. 1995)); Poehlman, 217 F.3d at 703 ("Quite obviously, by the time a defendant actually commits the crime, he will have become disposed to do so. However, the relevant time frame for assessing a defendant's disposition comes before he has any contact with government agents, which is doubtless why it's called predisposition."). While evidence of the defendant's response to the government's inducement may be relevant to the predisposition inquiry, that evidence must be evaluated in terms of what it reveals about the defendant's readiness to commit the crime before the government contacted him. See Gifford, 17 F.3d at 469.

We have advised trial courts that the following factors may be useful in evaluating the evidence of predisposition or lack thereof:

> (1) the character or reputation of the defendant; (2) whether the initial suggestion of criminal activity was made by the Government; (3) whether the defendant was engaged in the criminal activity for profit; (4) whether the defendant showed reluctance to commit the offense, which was overcome by the governmental persuasion; and (5) the nature of the inducement or persuasion offered by the Government.

Gamache, 156 F.3d at 9-10. The second, fourth, and fifth of these factors are also relevant to the improper inducement analysis. Thus, while improper inducement and lack of predisposition are two separate prongs, the same factual evidence will often be relevant to both prongs.

### 3. The Defendant's Burden of Production

A defendant is entitled to a jury instruction on entrapment if he meets a modest burden of production on the two prongs of the defense. United States v. Rodriguez, 858 F.2d 809, 814 (1st Cir. 1988). This rule is in keeping with the "general proposition [that] a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." Mathews v. United States, 485 U.S. 58, 63 (1988).

In analyzing whether the defendant has met his burden, the court must construe the evidence in the light most favorable to the defendant. Rodriguez, 858 F.2d at 813. An entrapment instruction is required if the evidence, viewed in this charitable

fashion, "furnishes an arguable basis for application of the proposed rule of law." Id. at 814 (quoting United States v. Coady, 809 F.2d 119, 121 (1st Cir. 1987)). In other words, the record must contain evidence that makes the entrapment theory "plausible" or "superficially reasonable." Gamache, 156 F.3d at 9. As we have previously emphasized, "[t]his is not a very high standard to meet." Id.

A defendant does not need to introduce his own evidence to meet this burden. Rodriguez, 858 F.2d at 813. He may rely on "evidence adduced during the government's case" or "any probative material in the record." Id. The proof may be "circumstantial rather than direct." Id. If there are factual disputes in the record, the court is not permitted to "weigh the evidence, make credibility determinations, or resolve conflicts in the proof." Gamache, 156 F.3d at 9. If the parties argue competing inferences, the court must draw all reasonable inferences in favor of the defendant's entrapment theory. Id. Ultimately, if "a reasonable jury could view the evidence as establishing that defendant was entrapped . . . [the defendant] [i]s entitled to an entrapment instruction." Teleguz, 492 F.3d at 84. Determining whether government conduct has crossed the line into improper inducement or whether a person was predisposed to commit an offense are delicate questions of fact for the jury to sort out. See Acosta, 67 F.3d at 338. Thus, a judge should not hesitate to send the

question to the jury if there is even ambiguous evidence of entrapment.

Once the defendant meets his burden of production, entrapment becomes a question of fact for the jury. Id. At that stage, the government bears the burden of proving beyond a reasonable doubt either that there was no improper inducement or that the defendant was predisposed to commit the offense. Id. If "a rational jury could decide either way, its verdict will not be disturbed." Id.

**IV.**

Consistent with our earlier explanation of the plain error standard, Pérez is entitled to relief if he is able to demonstrate that: (1) the district court erred in failing to give an entrapment instruction; (2) his entitlement to that instruction was clear or obvious; (3) the omission affected his substantial rights; and (4) it undermined the fundamental fairness of the trial. See Duarte, 246 F.3d at 60.

**A. Error**

The district court denied Pérez's requested entrapment instruction for failure to meet his burden of production on the lack of predisposition prong, without addressing whether Pérez had met his burden of production on the improper inducement prong. Because the defendant is required to meet the burden of production on both prongs, a court may deny an entrapment instruction based

on a failure to show evidence on one prong or the other, without discussing both. See, e.g., United States v. Rivera-Ruperto, 846 F.3d 417, 431 (1st Cir. 2017); United States v. Sánchez-Berríos, 424 F.3d 65, 77 (1st Cir. 2005). Because we disagree with the district court's assessment of the evidence on predisposition, we must consider both prongs. If the defendant failed to meet his burden of production on the improper inducement prong, an error by the judge in the assessment of the predisposition prong would be harmless.

We also repeat that improper inducement and predisposition are analytically linked in that improper inducement, and the defendant's responses to it, are part of the evidence courts should consider in deciding whether the defendant met his burden of production on the lack of predisposition prong. Gamache, 156 F.3d at 9-10; see Joost, 92 F.3d at 13-14 ("As for the absence of predisposition prong, much of what we have pointed to [in the improper inducement analysis] is relevant."). In evaluating the question of whether the defendant was predisposed, the factfinder must "abstract from -- . . . assume away -- the present circumstances insofar as they reveal government overreaching." Gendron, 18 F.3d at 962 (emphasis omitted). If there was no improper inducement, we already have our answer as to how the defendant would respond to "an ordinary opportunity to commit the crime" and any further analysis of predisposition is

unnecessary.  Id. (emphasis omitted).  But if there was improper inducement, the nature of that inducement and the defendant's responses to it are relevant to the predisposition analysis to the extent that they allow inferences about the defendant's state of mind prior to the government's intervention.  Rodriguez, 858 F.2d at 816 (considering evidence of the defendant's responses to improper inducement because "later events often may shed light on earlier motivations").

### 1. Improper Inducement

Agent Seig created a Grindr profile appearing to belong to an adult named "Dave W."  The profile described Dave as "[m]uscular, [w]hite, [s]ingle."  Pérez sent a message to that profile, presumably believing he was speaking with that adult man.  Dave quickly turned the conversation towards sexual activity with a minor by offering to arrange a sexual encounter with his eleven-year-old "boyfriend."  Dave said that both he and the minor would be part of the encounter, stating it would be "him you and I" and describing the encounter as a "threesome."  This type of "bundling of licit and illicit sex into a package deal" can constitute a "plus factor" for purposes of establishing improper inducement.  Hinkel, 837 F.3d at 118; see also Gendron, 18 F.3d at 961 (describing "the government's taking advantage of an alternative, non-criminal type of motive" as a "typical[]" example of an inducement plus factor).

- 29 -

Agent Seig, writing as Dave, represented from the start that the eleven-year-old minor was his "boyfriend" -- a term which suggests the legally impossible notion that the minor was a consenting participant in a sexual and romantic relationship with Dave. Agent Seig repeatedly stated that this imagined encounter would be a positive experience for the minor. Such repeated suggestions "downplay[ing] the harm" caused by child sexual abuse, or otherwise justifying it, can constitute a "plus factor" which a jury may rely on to find improper inducement. See Hinkel, 837 F.3d at 118 (stating that the defendant presented evidence of "clever and sophisticated inducement" where the law enforcement agent "on numerous occasions, downplayed the harm that could be expected to flow from the commission of the crime by describing how 'amazing' the encounter would be, how 'excited' 'Samantha' was, and how 'Lisa' 'appreciate[d]' how 'honest and caring' Hinkel had been in his messages"); Gamache, 156 F.3d at 11 (stating that the law enforcement agent's repeated "justifications for the illicit activity (intergenerational sex) by describing 'herself' as glad that Gamache was 'liberal' like her, expressing that she, as the mother of the children, strongly approved of the illegal activity, and explaining that she had engaged in this conduct as a child and found it beneficial" constituted evidence of improper inducement); see also Jacobson, 503 U.S. at 540 (describing the government's improper inducement as including repeated

"suggesti[ons] that petitioner ought to be allowed to do what he had been solicited to do," i.e., purchase child pornography).

Hence, the record contained evidence that would allow a jury to find two significant "plus" factors in Agent Seig's communications with Pérez: first, Seig's linking the opportunity for adult sexual activity, a lawful objective of Grindr users, with the unlawful sexual activity involving a minor -- establishing a kind of prerequisite for the adult activity; second, Seig's repeated suggestions that the illegal conduct was not harmful, but actually beneficial, to the minor. Thus, a reasonable jury could have found improper inducement -- a necessary precondition for a defendant to meet his burden of production on lack of predisposition.

## 2. Lack of Predisposition

Pérez met his burden of production on the lack of predisposition prong if the record would permit a reasonable inference by the jurors that, before his interaction with Agent Seig, Pérez was not predisposed to commit the crime of enticing a minor to commit unlawful sexual activity. See Gendron, 18 F.3d at 962. The five factors identified in Gamache guide our analysis. See 156 F.3d at 9-10.

As to the first factor, the character or reputation of the defendant, the evidence might include prior criminal convictions for similar offenses or a history of sexual interest

in minors.  Tellingly, the record contains no such evidence.  <u>See</u> <u>id.</u> at 12 ("[T]here was no evidence presented that Gamache had engaged in similar activities independent of this sting operation. The jury could have relied on this evidence to find a lack of predisposition . . . ."); <u>see</u> <u>also</u> <u>Hinkel</u>, 837 F.3d at 118 (stating that the defendant produced sufficient evidence to "clearly" meet his prima facie burden of a lack of predisposition because, inter alia, "the government had not uncovered any evidence suggesting that he had other underage victims").  The absence of any kind of negative character evidence relating to sexual activity with minors is one point in favor of allowing the entrapment instruction.

There are two statements from Pérez early in the conversation with Dave that "I started at 8."  As noted earlier, the exchange begins as follows:

Pérez: Hello what are you doing?

Dave: Hey what's up

Pérez: Let's see you

Dave: Cool, do you like really young guys?

Pérez: Yes
        Age?
        I started at 8

Dave: Me? 35, but my boyfriend is young

Pérez: Hahhaha Okk
        How old is he?

What does your boyfriend like?

Dave: He likes everything :)
      He is very young, what age do you like?

Pérez: The younger the better
       I don't discriminate
       I started at 8 hehehhe
       So you tell me
       What does he like to do?
       We are close, we can come up with some fun
       From there up I do it all

Dave: Do you understand English? I speak only a little
      Spanish
      My boyfriend is 11 years old.  Do you want to play
      with him?

Pérez: Mmmm yessss
       Where is he?
       I speak little only a little English?
       Share pics??
       You tell me when and where???
       Do you prefer to call?
       Yes, I want to play


The dissent states that, "in context," the exchange plainly reflects a "stark pre-dispositional admission by Pérez." In fact, however, the dissent ignores the context of Pérez's statements that "I started at 8."  Both statements are made before the notion of sex with a minor entered the conversation ("My boyfriend is 11 years old.  Do you want to play with him?").  Until Dave talks about his eleven-year-old "boyfriend," the conversation, which took place on a dating app for adults, can be read as discussing sex with young adults.  When Dave refers to himself as thirty-five, he could be saying that he is thirty-five

years old, or that he started having his sexual experiences at age thirty-five. Clearly, he (i.e., Agent Seig, posing as Dave) is not saying that his partners in his sexual experiences are thirty-five. It thus remains unclear, when Pérez reiterates that he "started at 8," whether he is referring to the beginning of his own sexual experiences or the age of boys with whom he has had sex.

The dissent similarly ignores the context when Pérez says, "the younger the better." Here, too, he makes the statement before Dave made any reference to his "boyfriend" being underage. Thus, it is hardly clear that Pérez is admitting to having an interest in children rather than meaning that he is interested in younger adults. The latter interpretation is plausible, particularly in light of Dave's reference to "really young guys," (the word "guys" tending to imply adults), and the fact that Pérez made the comments on an adults-only dating app. As for Pérez's apparent eagerness when he discovers that Dave's "boyfriend" is only eleven, we have said in our case law that "eagerness alone . . . is not sufficient to remove the predisposition question from the jury's purview." Gamache, 156 F.3d at 12.

Hence, the text is ambiguous enough that a jury, not a judge, needed to determine its meaning. See id. at 9 ("[T]he court's function is to examine the evidence on the record and to draw those inferences as can reasonably be drawn therefrom,

determining whether the proof, taken in the light most favorable to the defense can <u>plausibly</u> support the theory of the defense."). Thus, for the purpose of evaluating the evidence on the predisposition prong, the "I started at 8" statements do not provide evidence of a history of sexual interest in minors.

On the second factor, the initial suggestion of criminal activity, it is indisputable that the government first suggested the sexual abuse of a minor.  In fact, as we have noted, Pérez encountered law enforcement on a forum intended to be used only by adults.[9]  The jury could reasonably draw the inference from Pérez's use of Grindr that, before his conversation with "Dave," he was interested in sex with other adult men, not children.  Indeed, the expert psychologist who testified at sentencing drew this same inference, stating: "A pedophile will not be using, my personal clinical opinion, I don't think they will use Grindr because he will be easily identified."  Although Agent Seig testified that he designed his profile to contain "veiled" references which would be understood as suggesting sexual abuse of a minor "by someone who was versed in communicating in the realm of pedophiles," we must interpret the evidence in the manner most charitable to Pérez.

---

[9] Agent Seig testified that profiles explicitly seeking sexual encounters with minors "would be removed from the social network, because many people would report that and then the owners of the network would remove it."

Here, there is no basis for concluding on this record that Pérez understood these veiled references.

The third factor -- whether the defendant engaged in the criminal activity for profit -- is not relevant here, but we note that monetary profit was not at issue.

As for the fourth factor, "whether the defendant showed reluctance to commit the offense," the transcripts show that Pérez insisted on meeting Dave without the minor's presence. Taken in the light most favorable to Pérez, as it must be at this stage, this insistence can be read as a sign of some reluctance to commit the crime. Pérez made clear that any subsequent meeting with the minor would depend on how the meeting with Dave went, and it is a reasonable inference from the messages that Pérez had not made up his mind about actually meeting the child. A jury could also conclude from Pérez's insistence on meeting with Dave alone, his repeated statements that he wanted to get to know Dave first, and his clear interest in Dave, that Pérez was hesitant about moving beyond the realm of fantasy with a minor and was motivated by a desire to "be horny" with an adult in whom he was sexually interested. Although a jury could also conclude that Pérez intended to proceed directly to a meeting with the minor after seeing Dave and ensuring he was not a law enforcement officer, that plausible inference is not sufficient to take the entrapment defense from the jury. See Gamache, 156 F.3d at 10 (explaining

that whether the government disputes the defendant's version of the facts is "irrelevant to the question of whether it raises an issue of entrapment to be put before the jury"); Rodriguez, 858 F.2d at 815 (explaining that it is sufficient that "[the defendant's] version, whether or not it strikes us as particularly credible, is neither thoroughly implausible nor constructed entirely of gauzy generalities").

The fifth factor, "the nature of the inducement or persuasion offered by the Government," brings us back to the improper inducement analysis. From the very beginning of the conversation, Pérez expressed his interest in "Dave," an adult man. Before either party said anything about a minor, Pérez said to Dave, "Let's see you," likely meaning that he wanted to see a picture of "Dave." Later in the conversation, Pérez asked Dave for pictures again and for a physical description of his body. A juror could reasonably infer that Pérez was primarily motivated by sexual interest in "Dave," not the minor. Pérez also asked Dave questions about how he "got" his "boyfriend." Drawing inferences in favor of Pérez, these questions suggest that he asked them because he had not ever thought about or tried to entice a minor into sex before, and would not do so without the encouragement of the government agent and repeated statements "downplaying the harm," Hinkel, 837 F.3d at 118, or, even more offensively, normalizing the sexual behavior with the minor.

To be sure, there are different inferences one could draw from the communications between Pérez and Dave. But, in determining whether the defendant has met his burden of production, we are required to draw all inferences in favor of the defendant. The evidence relevant to the factors listed in Gamache provides at least some evidence of lack of predisposition. Thus, the record met Pérez's modest burden of production, and the district court erred by denying the entrapment instruction.

## B. Clear or Obvious Error

### 1. Relevant First Circuit Precedent

Prior to Pérez's trial in May 2017, our court had decided two significant cases addressing the circumstances in which a defendant is entitled to jury instructions on the entrapment defense in the context of child sexual abuse sting operations: Hinkel, 837 F.3d at 111, and Gamache, 156 F.3d at 1. Because these cases reveal the clarity of the district court's error, we describe their facts in some detail.

#### a. **Hinkel**

Hinkel was convicted of attempted enticement of a minor in violation of § 2422(b) -- the precise offense at issue here -- after email correspondence with a law enforcement agent posing as "Lisa," the thirty-eight-year-old mother of a fictitious fifteen-year-old girl, "Samantha." Hinkel, 837 F.3d at 116. Hinkel contacted "Lisa" based on a personal ad posted to an "online

- 38 -

message board . . . frequented by those seeking adult sex partners." Id. at 115. The ad stated, "mom with daughter looking for taboo relationship." Id. at 116. Hinkel responded with an email containing "graphic descriptions of sexual acts that he imagined engaging in with 'Lisa' and her daughter." Id. The government agent posing as "Lisa" promptly told Hinkel that her daughter was "15 but experienced," to which Hinkel responded, "Sounds very naughty! I am concerned about her age since legally she should be 16 or older." Id. The agent answered "she[']s not [16 or older] so i guess this conversation is over." Id. Hinkel immediately replied, "Nope..... It is not over! I want to talk more! I'm very intrigued by it all. Such taboo and naughty play!!!!" Id.

For the next month, Hinkel continued to correspond with Lisa in "lurid detail" about his desire to have sex with "Samantha," though he occasionally expressed "conflicting feelings." Id. at 116-17. Lisa reassured Hinkel, writing "i think you will love her...and i appreciate the way you describe our situation." Id. at 117. Hinkel also exchanged sexually graphic emails with Samantha directly. Id. Hinkel and Lisa made plans for Hinkel to visit and have sex with Samantha. Id. Lisa told him that the planned encounter would be "such an amazing experience for us to have together." Id. When Hinkel arrived at the appointed time and place, he was arrested and subsequently charged and

convicted of a § 2422(b) offense. Id. At his trial, the government introduced evidence of "five cartoons, which consist of detailed anime drawings of adults and minors engaged in sex acts" that law enforcement had found on Hinkel's computer. Id. at 122.

Hinkel's primary defense at his trial was entrapment, and -- unlike here -- the district court instructed the jury on the elements of that defense. Id. On appeal, Hinkel claimed the government's evidence was insufficient to overcome the entrapment defense. Id. We rejected that challenge because it was reasonable for the jury to find that entrapment had not occurred. Id. at 120. Of importance here, however, is our explicit consideration of whether Hinkel had satisfied his burden of production even though the district court had instructed the jury on entrapment. Id. at 118. Hence, although the posture of Hinkel was different, its discussion of the facts that clearly met the threshold for an entrapment instruction is directly applicable here.

### b. Gamache

Following a postal service correspondence with a law enforcement agent posing as a mother of three young children, Gamache was convicted of travel with intent to engage in illicit sexual conduct with a minor in violation of 18 U.S.C. § 2423(b), and an attempt to use a minor to produce sexually explicit images in violation of 18 U.S.C. § 2251(a). Gamache, 156 F.3d at 2. The agent had published a personal ad in an adult magazine which read,

in part, "female, 31; Single mom, two girls, one boy, seeks male as partner and mentor, seeks fun, enjoys travel and photography." Id. at 3.  Gamache responded with interest in the adult female author of the advertisement.  Id.

The agent, posing as "Frances," steered the correspondence toward sex with her three minor children, ages twelve, ten, and eight.  Id. at 4.  Frances wrote that she wanted to "introduc[e] an adult male to further [her] children's sexual education and experiences."  Id.  Gamache responded that he was "not shocked" and that he would be "honored" to be chosen as the adult man to have sex with Frances's children.  Id.  Over several months of continuing correspondence, Frances described sexual activities she wanted Gamache to engage in with her children, and Gamache replied in kind, sharing his own ideas and desires.  Id. at 4-7.  He also sent a letter to the children describing sexual activities he planned to engage in with them.  Id. at 7.  Throughout the correspondence, Frances referenced a "kind" uncle who "taught [her] about sex when [she] was very young, and wanting the same type of experience for [her] children."  Id. at 4-5 (alterations in original).  She told Gamache the children were "very excited about meeting" him, and they arranged for Gamache to meet "Frances" and her children at a motel.  Id. at 5-7.  When Gamache arrived at the motel, he was arrested.  Id. at 7.

Gamache requested an entrapment instruction at his trial, and the court rejected his request. Id. at 3. His objection was properly preserved and subject to plenary review. Id. at 9. We held that Gamache had met his burden of production on both prongs of the entrapment defense and that the court erred in failing to give the instruction. Id. at 12. We vacated the conviction and remanded for a new trial.

### c. Common Principles in Hinkel and Gamache

Our review of Hinkel and Gamache reveals that, at the time the district court rejected Pérez's request for an entrapment instruction, we had previously held that certain facts in combination -- present in both of those cases -- entitled a defendant to an entrapment instruction.

In both cases, the government originated the criminal design and invited the defendants to participate by placing an ambiguous advertisement in an adults-only forum; then, when the defendants responded to the advertisements, the government offered to arrange a sexual encounter involving a minor. Hinkel, 837 F.3d at 116; Gamache, 156 F.3d at 10. In both cases, we noted that the government agents used the tactic of "bundling . . . licit and illicit sex into a package deal," meaning that they offered a sexual encounter that would include both legal sex with an adult and illegal sex with a minor. Hinkel, 837 F.3d at 118; see also Gamache, 156 F.3d at 10. A key component of the government agent's

strategy in both cases was "downplay[ing] the harm" that would flow from the crime through repeated statements portraying sex with a minor as normal or even beneficial. Hinkel, 837 F.3d at 116; see Gamache, 156 F.3d at 10-11. In both cases, the defendants manifested some hesitancy to commit the offense, though most of their communications expressed eagerness to do so, and, ultimately, both defendants showed up for a meeting with the minor. Finally, in both cases, there was no evidence of the defendants' prior sexual activity with minors. Hinkel, 837 F.3d at 116; Gamache, 156 F.3d at 10.

Not surprisingly, given these similarities, we cited Gamache as apt precedent in stating that the defendant met his burden of production in Hinkel. The cases, of course, are not identical. Gamache involved a more prolonged period of correspondence and, arguably, more severe government manipulation. Despite those differences, however, when all inferences are drawn in favor of the defendant, the record in each case told, in essence, the same story: a defendant without any known prior sexual contact with minors moved from his initial, lawful inquiry about adult sex to what a jury could find was an attempt to commit an offense involving sexual exploitation of a minor, prompted by encouragement from the government that a reasonable juror could deem improper inducement.

### 2. Comparing Pérez's Case with <u>Hinkel</u> and <u>Gamache</u>

#### a. Initiation by the Government Agent

Like the law enforcement agents in <u>Hinkel</u> and <u>Gamache</u>, Agent Seig purported to be an adult using a forum for adults seeking adult sexual partners, and alluded to the possibility of a relationship with a younger person without specifying the nature of the relationship or the age of the young person. See <u>Hinkel</u>, 837 F.3d at 116; <u>Gamache</u>, 156 F.3d at 10. Pérez took the bait and contacted the agent. Like Hinkel and Gamache, his initial message did not include any reference to sex with a minor. He wrote, "Hello what are you doing?" and then "Let's see you." It was the government agent who turned the conversation to sex with minors, asking if Pérez "liked really young guys," and then, when he responded affirmatively, making the offer of sex with a minor: "My boyfriend is 11 years old. Do you want to play with him?" When Pérez again responded affirmatively, Agent Seig made that offer more explicit, asking what sex act Pérez wanted to engage in with the minor. While Pérez expressed enthusiastic interest, "[i]t was the Government that first mentioned the 'child[]' as [a] sex object[]; it was the Government that first used sexually explicit language involving the 'child[]'; [and] it was the Government that escalated the subject of sex with [the] child[]." <u>Gamache</u>, 156 F.3d at 10.

### b. Government's Bundling of Licit and Illicit Sex

Agent Seig's sting operation relied on precisely the same tactic we described in Hinkel and Gamache: the "bundling of licit and illicit sex into a package deal." Hinkel, 837 F.3d at 118; see also Gamache 156 F.3d at 10. Pérez reached out to Dave -- described as a "[m]uscular, [w]hite, [s]ingle" adult man -- on an adult dating application. He clearly remained interested in the adult throughout the conversation, including asking for photos just of Dave when Dave would not send photos of the minor. These circumstances permit a plausible inference that Pérez was not predisposed to sexually abuse a child, but, rather, was motivated by interest in sex with Dave. See Gamache, 156 F.3d at 10 (noting a plausible argument that "all of [Gamache's] correspondence about sex with minors was a ruse to have sex with 'Frances,' who was his target from the time that he answered the ad").

### c. Government Agent's Statements Normalizing Sexual Abuse

Dave's comments repeatedly portraying sex with a minor as normal or even beneficial resemble those made by the agents in Hinkel and Gamache. See Hinkel, 837 F.3d at 118 (stating that the agent "downplayed the harm that could be expected to flow from the commission of the crime by describing how 'amazing' the encounter would be"); Gamache, 156 F.3d at 11 ("[T]he government agent provided justifications for the illicit activity [by] . . .

expressing that she, as the mother of the children, strongly approved of the illegal activity, and explaining that she had engaged in this conduct as a child and found it beneficial to her."). The government's perverse statements that the minors would enjoy and benefit from sexual exploitation were important because such suggestions have the potential to influence the mind of a person who is not predisposed to abuse children and convince him that sex with a minor is acceptable. See Gamache, 156 F.3d at 11 ("These solicitations suggested that Gamache ought to be allowed to engage in the illicit activity . . . .").

### d. Defendant's Reluctance to Commit the Offense

As in Hinkel and Gamache, some of Pérez's actions could be interpreted as reluctance to commit the offense. He repeatedly insisted on meeting with Dave alone, without the minor's presence. That demand could be interpreted as an indication that he was reluctant to go through with meeting the minor, despite his many statements of enthusiasm about doing so.

To be sure, Pérez's plausible expression of reluctance differed from the more explicit statements in Hinkel and Gamache. Still, there was no outright rejection of the criminal conduct in either of those cases. Hinkel briefly indicated hesitation when "Lisa" told him that her daughter was fifteen, but clearly overcame his reluctance just moments later, stating in response to an obvious exit opportunity, "Nope..... It is not over! I want to

talk more! I'm very intrigued by it all. Such taboo and naughty play!!!!"[10] See Hinkel, 837 F.3d at 116. Hinkel subsequently did arrange and show up at a meeting with the fictitious fifteen-year-old. Id. at 117. Gamache initially resisted Frances's suggestion that he bring a video camera, but he stated his hesitance was based on technological ignorance, not any moral opposition to creating child pornography. See Gamache, 156 F.3d at 12. In the end, Gamache did show up for a meeting with the children and brought a video camera with him.

### e. Defendant's Eagerness to Commit the Offense

Aside from his insistence on meeting Dave separately prior to meeting the minor, Pérez's responses to Dave's suggestions of sexual activity with an eleven-year-old boy were decidedly not reluctant. His immediate response to Dave's offer of sex with his "boyfriend" was "yes," and he made explicit statements about the sex acts he wanted to engage in with the boy.[11] Gamache and Hinkel

---

[10] In an apparent attempt to suggest that Hinkel was reluctant to engage in sex with a minor in a way that Pérez was not, the dissent ignores this quick abandonment of any hesitation in its characterization of Hinkel's response to the prospect of sex with a minor.

[11] The dissent focuses on this immediate affirmative response, suggesting that Pérez's enthusiasm made the necessity of an entrapment instruction in this case unclear, and, thus, its omission was not plain error. But our precedent has been clear on this point: "[E]agerness alone . . . is not sufficient to remove the predisposition question from the jury's purview." Gamache, 156 F.3d at 12. Similarly, the dissent emphasizes that Pérez went

- 47 -

expressed similar reactions to law enforcement agents' criminal suggestions. See Hinkel, 837 F.3d at 118 (describing the defendant's response as "eager[]"); Gamache, 156 F.3d at 11 (describing the defendant's response as "enthusiastic"). Both Hinkel and Gamache gave graphic descriptions of the sex acts they wanted to engage in with minors. See Hinkel, 837 F.3d at 116 (stating that "Hinkel corresponded frequently and in lurid detail with 'Lisa' and her fictitious daughter 'Samantha'" and that he "describ[ed] his own sexual desires in detail"); Gamache, 156 F.3d at 6 (describing a letter from Gamache to Frances that "explain[ed], at length and in detail, how he will carry about the sexual 'education' of 'Frances'' 'children'").

Our holdings in Hinkel and Gamache make clear that a defendant can meet his burden of production on lack of predisposition even if he responded eagerly or enthusiastically to the proposed criminal conduct. As we have noted, in Gamache we explained, "[W]hile 'ready commission of the criminal act can

_____

to meet with Dave just five days after the first message. This time frame may be another display of eagerness, certainly worthy of the jury's consideration, but it did not warrant withholding the entrapment instruction from the jury when other evidence in the record supported a finding of a lack of predisposition. The dissent also overlooks the fact that Pérez was arrested, not at a planned meeting with the minor, but rather, at a meeting with Dave. Read in the light most favorable to Pérez, he was prepared to meet with the adult intermediary alone, but had not clearly agreed to meet with the minor. By contrast, Hinkel and Gamache were arrested at planned meetings with minors. See Hinkel, 837 F.3d at 116; Gamache, 156 F.3d at 7.

itself adequately evince an individual's predisposition' and thus provide sufficient evidence to support a jury's finding that the defendant was predisposed to commit the offense, eagerness alone, when coupled with the 'extra elements' present in this sting operation, is not sufficient to remove the predisposition question from the jury's purview." 156 F.3d at 12 (citation omitted) (quoting Gifford, 17 F.3d at 469); see also id. at 11-12 ("[W]illingness to commit the crime, although clearly relevant to the jury's inquiry, is not sufficient by itself to mandate a finding that he was predisposed."); Rodriguez, 858 F.2d at 816 ("Although a jury might well find that Rodriguez's wiliness, and the level of experience and enthusiasm which he subsequently exhibited, were inconsistent with the claim of initial unreadiness, such a finding would not be inevitable.").

### f. Prior Sexual Interest in Children

As Pérez notes, the trial record contained "absolutely no evidence that, aside from this virtual conversation, Mr. Pérez had engaged, tried to engage, or would have considered engaging in sex with a minor."[12]  In Gamache, we emphasized the importance of the absence of evidence of prior similar conduct in meeting the defendant's burden of production on lack of predisposition. See

---

[12] As noted above in Section IV.A.2., the meaning of Pérez's statements that "I started at 8" is ambiguous.  If all inferences are drawn in his favor, those statements do not constitute evidence of prior sexual interest in children.

Gamache, 156 F.3d at 12 ("[T]here was no evidence presented that Gamache had engaged in similar activities independent of this sting operation. The jury could have relied on this evidence to find a lack of predisposition . . . .").

Of course, to address the burden of production on the predisposition issue, a defendant could introduce some evidence of positive relationships with children, though Gamache makes clear that the defendant need not introduce such evidence to meet that burden. See id. Indeed, Hinkel offered evidence that he "had raised two adult children and had not been accused of having an inappropriate relationship with either of them." Hinkel, 837 F.3d at 118. However, in Hinkel, there was contrary evidence that Hinkel had sexual interest in children before the contact with the government, in the form of cartoon images of adult sexual conduct with children recovered from his computer. Id. at 122. Hinkel challenged the admission of that evidence on appeal. Id. In rejecting that claim, we recognized that the images were "probative of Hinkel's predisposition" and may tend to show "sexual inclination towards children." Id. (quoting United States v. Chambers, 642 F.3d 588, 595-96 (7th Cir. 2011)). Still, even with the record containing evidence of Hinkel's sexual inclination towards children, we agreed with the district court that Hinkel had provided enough evidence of lack of predisposition to mount a

"credible entrapment case." Id. at 118.  Again, there was no such evidence of Pérez's prior sexual interest in children.

### 3.  Conclusion

As we have described, this case is strikingly similar to Hinkel and Gamache.  Agent Seig used the same tactics we saw in those cases -- placing an ambiguous lure on an adults-only forum, inviting the defendant who responded to the lure to engage in a "bundled" sexual encounter with an adult and a child, and repeatedly insisting that this sexual abuse was beneficial to the child.  Pérez responded similarly to Hinkel and Gamache -- enthusiastic interest coupled with a weak expression of reluctance.  And as in Gamache, the record at Pérez's trial contained no evidence of any sexual interest in children prior to the government's intervention.

In Hinkel, we stated that the facts "clearly" met the defendant's "'modest' burden of making a prima facie showing that there is some evidence both elements [of the entrapment defense] are satisfied."  Hinkel, 837 F.3d at 117; see also id. at 118 (stating that the evidence at Hinkel's trial supported "a credible entrapment case").  In Gamache, we concluded that "appellant met the dual burdens required for an instruction on entrapment, because the evidence raises a reasonable doubt that the Government improperly induced a citizen to commit crimes that he was not predisposed to commit, yet crimes for which he was charged and

convicted." Gamache, 156 F.3d at 12. The district court ignored our precedents when it decided a trial record containing strikingly similar core facts did not warrant an entrapment instruction because the defendant did not meet his burden of production on the predisposition prong of the defense.

Tellingly, the government's brief on appeal does not even mention Hinkel or Gamache, much less attempt to distinguish those cases from the circumstances present here. The government's primary argument is that Pérez cannot meet his burden on lack of predisposition because he "jumped at the opportunity to 'play' with the 11-year-old boyfriend." That position is obviously foreclosed by our case law, and, if it influenced the district court's decision to deny the entrapment instruction, it should not have.

The dissent claims that comparing this case to Hinkel and Gamache is like "saying apples and oranges are 'clearly and obviously' the same because they both grow on trees in orchards." To be sure, there are distinctions among the three cases, but all three involve a mix of evidence -- some favorable to the entrapment defense, some tending to disprove entrapment. Each case involved statements reflecting eagerness and others reflecting reluctance. Although those statements appeared in conversations which played out across different time frames featuring different modes of communication, and the specific facts of the cases do not perfectly

align, there is the significant overlap in the categories of facts that we have described. The district court's failure to see that overlap between this case on the one hand, and <u>Hinkel</u> and <u>Gamache</u> on the other -- cases in which we stated the predisposition issue needed to go to the jury -- was a clear error. Although there are many varieties of apples, they are apples all the same.

## C.    Substantial Rights

Next, we ask whether the clear or obvious error affected the defendant's substantial rights. By refusing to give an entrapment instruction, the court denied Pérez an opportunity to have the jury consider his primary defense. <u>See</u> <u>United States</u> v. <u>Benavidez</u>, 558 F.2d 308, 309 (5th Cir. 1977). As we have discussed at length, Pérez's entrapment defense, reviewed in the light most favorable to him, as required by law, was plausible. There was a reasonable probability that a rational jury could credit the defense, even in the face of the government's attempt to disprove the entrapment defense beyond a reasonable doubt. <u>See</u> <u>United States</u> v. <u>Benjamin</u>, 252 F.3d 1, 9 (1st Cir. 2001) (stating that to determine whether an error affected the defendant's substantial rights, the court "must determine 'whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted [jury instruction]'" (quoting <u>Neder</u> v. <u>United States</u>, 527 U.S. 1, 19 (1999))). Thus, Pérez's substantial rights were affected.

## D.    Fundamental Fairness

Finally, we ask whether this error is one that "impugn[ed] the fairness, integrity, or public reputation of the criminal proceeding as a whole."  United States v. Padilla, 415 F.3d 211, 221 (1st Cir. 2005).  Our analysis under this final prong of plain error review is "flexible . . . and depends significantly on the nature of the error, its context, and the facts of the case."  United States v. Gandia-Maysonet, 227 F.3d 1, 6 (1st Cir. 2000).

Entrapment is a judicially created defense reflecting a recognition that "[m]anifestly, [the law enforcement] function does not include the manufacturing of crime."  Sherman, 356 U.S. at 369 (citing Sorrells v. United States, 287 U.S. 435, 443 (1932)).  Given the importance of the defense, erroneous or confusing jury instructions regarding entrapment compromise the fairness of a trial.  E.g., United States v. Kopstein, 759 F.3d 168, 182 (2d Cir. 2014) (holding that misleading jury instructions regarding entrapment, the defendant's "only viable defense," created so much confusion as to "call into question the fairness and integrity of [the defendant's] conviction" (quoting United States v. Rossomando, 144 F.3d 197, 201 (2d Cir. 1998))); United States v. Burt, 143 F.3d 1215, 1219 (9th Cir. 1998); United States v. Duran, 133 F.3d 1324, 1335 (10th Cir. 1998); Here, we did not have an instruction that was problematic because it was confusing.

Rather, we had a complete failure to instruct the jury on the defendant's primary defense. See Benavidez, 558 F.2d at 310. Because of the court's refusal to give Pérez's requested instruction, "the jury was not in a position to fairly evaluate the defendant's case," see id., as it did not know that the government was required to prove beyond a reasonable doubt that either no improper inducement took place, or that Pérez was predisposed to commit the offense. It is fundamentally unfair to allow a jury to convict without instructing it on the law relevant to a plausible entrapment theory that was "fairly raised" at trial. Id.

This is not the common plain error case where the failure of a defendant to properly preserve an objection for de novo review means that the trial court never had an opportunity to rule on the matter at issue. Pérez requested an entrapment instruction before trial and renewed his request at a charging conference shortly before the jury instructions were delivered. Although these steps did not preserve Pérez's challenge under our circuit's law -- because he did not renew his objection after the court charged the jury -- the fact remains that the court was fully advised that Pérez sought the instruction, and objected to its denial, because he intended to rely, and did in fact rely, on entrapment as a

defense.[13]  Yet, the court denied the request in a single conclusory sentence, providing no explanation for its determination that Pérez had not met his burden of production on the predisposition prong of the defense.[14]

Pérez is now serving a sentence of 151 months' (twelve and a half years') imprisonment based on the outcome of a trial at which the court summarily and improperly excluded his primary defense.  Under these circumstances, the trial court's clear or obvious error in refusing to present Pérez's entrapment defense to the jury affected his substantial rights and undermined the fundamental fairness of his trial.  To correct that error, we must remand for a new trial.

**V.**

Given that we are remanding for a new trial, we choose to comment on one aspect of any new trial: the voir dire process.

---

[13] As noted above, Pérez also failed to object on the record when the judge invited objections immediately before instructing the jury.  Despite this omission, the trial record makes clear that the district court was aware of Pérez's objection.

[14] To the extent that it might be relevant to the fourth prong analysis, we note that the retrial in this case will not require a victim to endure a second trial.  Obviously, there was no actual victim of child sexual abuse in this attempt case.  Cf. United States v. Colon-Nales, 464 F.3d 21, 29 (1st Cir. 2006) ("Given the unchallenged nature of the evidence in this case . . . the greater threat to the 'fairness, integrity and public reputation of judicial proceedings' would be to send this back for trial . . . thereby requiring the carjacking and rape victim to testify twice.")

See, e.g., United States v. Gonzalez-Maldonado, 115 F.3d 9, 13 (1st Cir. 1997) ("In order to give as much guidance as possible to the district court, we also discuss some of the other claims that are likely to resurface if there is a new trial."). Pérez insists that there was error in the district court's handling of the voir dire. We do not go that far. But the briefing has convinced us that the court would be well-advised to explore the issue of anti-gay bias more thoroughly than it did in the voir dire process reflected in the record.

The court devoted only one question to the topic of anti-gay bias, asking the panel: "Do you feel that you would not be able to render a fair and impartial verdict based on the evidence and my instructions if the defendant were homosexual or gay?" On remand, the court should carefully consider Pérez's argument that this single self-assessment question "was inadequate to permit discovery of stereotypical and pejorative notions rooted in an extremely relevant bias." As Pérez notes, this case raises particular concerns about anti-gay bias not only because the defendant is gay, but because of the graphic sexual nature of the evidence and the repugnant but unfortunately widespread prejudicial belief that gay men are likely to sexually abuse

children.[15]  Questions probing prospective jurors' actual bias against gay men -- rather than their self-assessment of their ability to be impartial at a criminal trial where the defendant is gay -- would be more useful in identifying jurors who could not be fair and impartial in dealing with the difficult facts of this case.

**Vacated and remanded**.

**- Concurring Opinion Follows -**

---

[15] See Perry v. Schwarzenegger, 704 F. Supp. 2d 921, 983 (N.D. Cal. 2010) ("[S]tereotypes imagine gay men and lesbians as . . . child molesters who recruit young children into homosexuality.  No evidence supports these stereotypes."), aff'd sub nom. Perry v. Brown, 671 F.3d 1052 (9th Cir. 2012); Luke A. Boso, Dignity, Inequality, and Stereotypes, 92 Wash. L. Rev. 1119, 1142-43 (2017) (discussing manifestations of the false stereotype that gay men are likely to be pedophiles).

**LIPEZ, Circuit Judge, concurring.** I write separately to urge our court in a future en banc proceeding to abandon the rigid and outdated interpretation of Rule 30(d) of the Federal Rules of Criminal Procedure that we had to apply in this case. We are the only circuit that -- without regard for the specificity or timing of a party's initial objection to jury instructions -- deems that objection forfeited if it is not repeated after the court instructs the jury. See United States v. Roberson, 459 F.3d 39, 45 (1st Cir. 2006). That preservation requirement serves no useful purpose in the administration of justice, and it is premised on practicalities that no longer exist.

To be clear, I do not raise this issue because of any reservations about the strength of the majority's plain error analysis in this case. Rather, I am concerned about the impact of our existing rule on criminal defendants who cannot meet that exacting standard in other instances where it is inappropriately applied. Pérez's case provides a helpful illustration of why the rule requiring a pointless post-charge objection is misguided.

Before his trial commenced, Pérez filed an ex parte request for an entrapment jury instruction. At the close of evidence in the two-day trial, the parties participated in an unrecorded charging conference. Even without a record of the conference, it is clear from the district court's docket entry that Pérez renewed his request for an entrapment jury instruction.

The district court denied the instruction, stating: "The ruling is based on the arguments presented by the government and defendant's response during the charging conference in connection with predisposition."[16]  Following the conference, the attorneys gave their closing arguments and the court then proceeded to charge the jury. It did not invite objections from the parties, and Pérez did not raise an objection.

Under our court's interpretation of Rule 30(d), Pérez forfeited his claim that he was entitled to an entrapment instruction, subjecting that claim to plain-error review.  See Fed. R. Crim. P. 52(b).  In other words, our law faulted Pérez for failing to reiterate an objection that had just been rejected at the charging conference.  See United States v. Meadows, 571 F.3d 131, 146 (1st Cir. 2009) ("Objections registered during pre-charge hearings are insufficient to preserve the issue." (quoting Roberson, 459 F.3d at 45)).

Rule 30(d) does not require that interpretation.  It states: "A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court

_____

[16] Before instructing the jury, the court asked the parties if there were objections to the instructions.  Pérez did not object at that time, but that lack of objection  would not matter because our precedent requires the objection to be made after the jury is instructed.  See Roberson, 459 F.3d at 45.  Even if Pérez had objected when invited to do so by the judge, his claim would still be considered forfeited and subject to plain error review on appeal.  Id.

of the specific objection and the grounds for objection before the jury retires to deliberate." By its terms, then, the rule requires only that the party's objection be specific, explained, and presented before the jury deliberates. Pérez satisfied each of those requirements.

Our rule insisting on a post-charge objection under Rule 30(d) has its origins in a decades-old, out-of-circuit precedent -- authored by one of our First Circuit colleagues sitting by designation -- that involved the similar requirement in civil cases to timely raise instructional challenges. See Fed. R. Civ. P. 51. In that 1966 case, Judge Aldrich observed that "[t]he duty imposed upon counsel of 'stating distinctly the matter to which he objects and the grounds of his objection' cannot normally be performed until the charge has been heard in its entirety." Dunn v. St. Louis-San Francisco Ry. Co., 370 F.2d 681, 684 (10th Cir. 1966) (Aldrich, J. sitting by designation) (quoting then-current language of Fed. R. Civ. P. 51). Based on that view -- i.e., that specificity will likely be infeasible before counsel hears the instructions as given -- the panel in Dunn concluded that an instructional objection ordinarily will be deemed preserved only if it is voiced after the court charges the jury. See id. We subsequently adopted that post-charge preservation rule in our circuit, including for criminal cases governed by Rule 30(d). See United States v. Leach, 427 F.2d 1107, 1113 (1st Cir. 1970) (citing

Dunn as precedent for concluding that a claim for a jury instruction was forfeited where counsel requested the instruction but did not renew his objection after the instructions were delivered). While Dunn allowed for limited exceptions to the requirement that objections be made after the jury charge, see 370 F.2d at 684, the First Circuit requires a post-charge objection in all criminal cases.[17] See United States v. Coady, 809 F.2d 119, 123 (1st Cir. 1987) (rejecting an argument that a claim regarding jury instructions could be preserved through a pre-charge objection, stating, "[t]hat counsel may have discoursed upon the nature of his theory at some time prior to the giving of the charge will not excuse noncompliance with the express mandates of Rule 30").

The Dunn rationale for requiring a post-charge objection in most cases may have been apt when it was articulated more than a half-century ago. The judges of that era did not routinely give lawyers advance copies of their proposed instructions for discussion and debate at charging conferences. Indeed, even during

---

[17] In a civil proceeding, the trial court has been required since 2003 to "inform the parties of its proposed instructions and proposed action on the requests [for instructions] before instructing the jury and before final jury arguments," Fed. R. Civ. P. 51(b)(1) (emphasis added), and it "must give the parties an opportunity to object on the record and out of the jury's hearing before the instructions and arguments are delivered," id. at (b)(2). The rule states that an objection is timely if made "at the opportunity provided under Rule 51(b)(2)."

my tenure as a Maine state trial judge two decades later -- in the late 1980s and early 1990s -- most judges did not preview instructions with counsel in their entirety before delivering them. Hence, the general practice supported the assumption that parties ordinarily could not object with the specificity required by Rules 51 and 30(d) until they heard the instructions as delivered.

That is simply not the current reality. Today, attorneys are well-positioned to make specific objections to assist the judge in correcting errors before he or she charges the jury. The court's ability to distribute proposed instructions in advance and to easily revise them on the computer means that the attorney's obligation to object with specificity can now be -- and ordinarily is -- performed before "the charge has been heard in its entirety." Dunn, 370 F.2d at 684. My experience as an appellate judge reading trial records tells me that, as a result of this current practice, surprises in the instructions as given are rare. Thus, by maintaining our rule, we impose the harsh consequence of plain-error review without justification.

We are an outlier in requiring a post-charge objection in criminal cases under all circumstances. Every other circuit that has considered the sufficiency of a pre-charge objection employs a more flexible approach, in which a pre-charge objection is evaluated for its adequacy in meeting Rule 30(d)'s requirements

to provide the trial court with specific notice of an asserted instructional error.  See United States v. Grote, 961 F.3d 105, 115 (2d Cir. 2020) (an objection prior to jury charge is not forfeited if "taking further exception under the circumstances would have been futile" (quoting United States v. Rosemond, 841 F.3d 95, 107 (2d Cir. 2016)); United States v. Russell, 134 F.3d 171, 178 (3d Cir. 1998) ("[T]he crux of Rule 30 is that the district court be given notice of potential errors in the jury instructions, not that a party be 'required to adhere to any formalities of language and style to preserve his objection on the record.'" (quoting United States v. O'Neill, 116 F.3d 245, 247 (7th Cir. 1997)); United States v. Hollinger, 553 F.2d 535, 543 (7th Cir. 1977) ("[S]pecific and distinct objections voiced in an earlier instructions conference held in the presence of a court reporter will be considered timely under [Rule 30(d)] . . . . [W]e shall henceforth allow counsel to incorporate [objections] by reference."); United States v. Kessi, 868 F.2d 1097, 1102 (9th Cir. 1989) (parties need not object following the instructions if doing so would be a "pointless formality"); United States v. Kottwitz, 614 F.3d 1241, 1270 (11th Cir. 2010) (objection is preserved so long as it is "sufficient to give the district court the chance to correct errors before the case goes to the jury"), opinion withdrawn in part on denial of reh'g on other grounds, 627 F.3d 1383 (11th Cir. 2010); see also United States v. McDonnell,

792 F.3d 478, 504 & n.15 (4th Cir. 2015) (noting that the appellant objected at a pre-charge conference and should have repeated his objection after the instructions were delivered, but still applying harmless error review, rather than plain error), vacated on other grounds, 136 S. Ct. 2355 (2016);[18] United States v. Bornfield, 184 F.3d 1144, 1146 (10th Cir. 1999) (stating that a party is "obligated to object on the record before the jury retired to preserve his objection for appellate review" and acknowledging that the objection might properly occur at a pre-charge conference).

That flexible approach not only fulfills the notice purpose of Rule 30(d), but it also aligns with our forfeiture doctrine more broadly. Issues not raised in the trial court are deemed forfeited, and subject to plain error review on appeal, to prevent a party from wasting judicial resources and undermining finality by "sandbagging" the court. See Puckett v. United States, 556 U.S. 129, 134 (2009) ("[T]he contemporaneous-objection rule

---

[18] Indeed, on further review, the Supreme Court also applied a harmless error analysis and vacated the conviction on the ground that an error in the jury instructions was not harmless. See McDonnell, 136 S. Ct. at 2375. The Supreme Court did not comment on the timing requirements of Rule 30(d) or explicitly affirm a flexible application of the rule. Although McDonnell is not binding intervening precedent that would require us to abandon our current rule, see United States v. Walker-Couvertier, 860 F.3d 1, 8 (1st Cir. 2017), it does give tacit approval to review for harmless error rather than plain error when an appellant objected at a pre-charge conference but not after the instructions were delivered.

prevents a litigant from 'sandbagging' the court -- remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor."); United States v. Correa-Osorio, 784 F.3d 11, 22 (1st Cir. 2015) (stating that the plain error rule "(hopefully) deters unsavory sandbagging by lawyers (i.e., their keeping mum about an error, pocketing it for later just in case the jury does not acquit) and gives judges the chance to fix things without the need for appeals and new trials"). Our obsolete interpretation of Rule 30(d) does nothing to prevent "sandbagging." Where, as in this case, a defendant files a written request for an instruction, and argues for that request at a charging conference, he is not "sandbagging" when he raises that same issue on appeal. He has clearly brought the issue to the trial court's attention and given the court an opportunity to correct the instructions.

Indeed, from a practical standpoint, an objection made during a charging conference, before the instructions have been delivered, should be preferred to a post-charge objection. The earlier notice provides more timely opportunity for the court to correct any errors. See Hollinger, 553 F.2d at 542-43 ("Ordinarily, trial judges will derive considerable benefit from a serious exchange of views by opposing counsel regarding the proper formulation of the applicable rules of law before they must charge the jury."). In addition, when a request regarding jury

instructions has been discussed in detail at a charging conference, and the court has ruled, there is no advantage to anyone for lawyers to persist with the same objection. To the contrary, such persistence can be awkward for counsel and off-putting for the court. See United States v. Toribio-Lugo, 376 F.3d 33, 41 (1st Cir. 2004) ("To do her job, a lawyer must be forceful, but she also must handle her relationship with the presiding judge with care."); United States v. Kelinson, 205 F.2d 600, 601-02 (2d Cir. 1953) ("[Rule 30(d)] does not require a lawyer to become a chattering magpie.").

Importantly, I am not suggesting that a party's failure to lodge an objection after the court has delivered the jury charge should never result in forfeiture of the claim on appeal. Inevitably, some pre-charge objections will be insufficiently specific, or inadequately explained, and will therefore not fulfill the notice objective of Rule 30(d). But Rule 30(d) does not require us to demand pointless repetition of objections that were distinctly raised and decisively denied.

In short, our court's outdated, inflexible approach to Rule 30(d) neither advances the purpose of the rule nor serves the interests of justice and, hence, it poses an unjustifiable barrier to plenary appellate review of fully preserved objections. We should replace our outmoded instructional-error doctrine with the flexible approach that -- for good reason -- is now the prevailing

view.    In other words, like our sister circuits, we should recognize that a pre-charge objection may preserve a jury instruction issue for appellate review if the objection was sufficiently specific to give the trial court notice of the claimed error and repetition of the objection post-charge would be a futile exercise.

**- Concurring Opinion Follows -**

**BARRON**, <u>**Circuit Judge**</u>, **concurring**. I share the concern that Judge Lipez expresses about the way that our precedent currently requires us to construe Rule 30(d) of the Federal Rules of Criminal Procedure. The text of the rule, his concurrence points out, does not compel the rigid procedure for preserving objections to jury instructions that our case law requires. There may often be benefits to voicing objections to instructions after the charge to the jury has been given. But, they are not manifest in every case. Indeed, the case at hand exemplifies the point. The sole ground that the District Court gave at the charging conference for denying the requested instruction here was that the evidence developed at trial had failed to provide a factual basis for giving it. Nothing about the charge itself could have called that ruling into question. Yet, our precedent still requires that we treat this defendant's failure to seek reconsideration of that ruling as if it were a failure to have requested the instruction at all. See <u>United States</u> v. <u>Baltas</u>, 236 F.3d 27 (1st Cir. 2001).

**- Dissenting Opinion Follows -**

**KAYATTA**, <u>Circuit Judge</u>, dissenting.

The majority's analysis hinges crucially on the assertion that, as to the matter of predisposition, this case is so like <u>Hinkel</u> and <u>Gamache</u> that the need for an entrapment instruction was "clear or obvious." Respectfully, I cannot see how this is so in this case.

Here is what Hinkel said when he first learned that a 15-year-old was involved: "Sounds very naughty. I am concerned about her age since legally she should be 16 or older." It then took a month before the continued enticement ripened into a planned meeting. Here, by contrast, is what Pérez said upon first learning that an eleven-year-old was involved: "Mmmm yes." Within three days Pérez was messaging, "I want your boyfriend." And within five days from the first message, the meet was on.

There is more. Hinkel offered affirmative evidence that he had never sought a relationship with someone not of legal age. Pérez offered no such evidence. Rather, when the agent asked Pérez at the outset of their communications "what age do you like?," Pérez replied, "The younger the better. I don't discriminate. I started at 8. Hehehe. So you tell me." And when asked "do you like really young guys?," he replied: "Yes. Age? I started at 8." So while Hinkel was saying he never even looked for sex with a minor, Pérez was highlighting a nondiscriminatory track

record.  And he was clearly saying in context that eight years old was not too young.

Gamache is even further removed.  The defendant in Gamache initially expressed interest solely in an adult relationship.  Only after "the Government's insistence and artful manipulation" over the course of eight months did he become ready to meet the supposed victims, and even then he was saying "this will be a new experience for me."  United States v. Gamache, 156 F.3d 1, 6, 10 (1st Cir. 1998).  Pérez, conversely, expressed eager interest immediately.  And unlike Hinkel and Gamache, he offered no evidence suggesting a lack of predisposition.

The majority's effort to avoid the stark pre-dispositional admission by Pérez at the very outset of his exchanges with the agent warrants particular scrutiny.  Ignoring Pérez's express assurance that he likes them the "younger the better," all the majority can do is claim that there is some ambiguity about what the agent meant when he subsequently referred to his own age.  And the majority's claim that it is not obvious what Pérez was saying is twice-flawed:  It certainly seems obvious he was indeed saying he likes them "the younger the better;" and, in any event, I do not see how it was possibly plain error for the trial court to have read Pérez's statement exactly as I do, i.e., as a frank, un-coaxed profession of the precise predisposition at issue.  And since there is zero contrary evidence, I simply cannot

see how it was also plain error to conclude that Pérez failed to generate a sufficient claim of entrapment to get to a jury.  See Gamache, 156 F.3d at 9 ("The defendant carries the initial burden of producing some evidence of both the Government's improper inducement, and the defendant's lack of predisposition to commit the alleged offense, so as to 'raise a reasonable doubt as to whether he was an unwavering innocent rather than an unwavering criminal.'" (quoting United States v. Joost, 92 F.3d 7, 12 (1st Cir. 1996)) (second emphasis added)); see also id. ("[T]he court's function is to examine the evidence on the record and to draw those inferences as can reasonably be drawn therefrom, determining whether the proof, taken in the light most favorable to the defense can plausibly support the theory of the defense." (first emphasis added)).

The bottom line is that the majority significantly errs in comparing Hinkel and Gamache to this case by noting the similarities while ignoring or downplaying the very material differences.  The resulting reasoning is like saying apples and oranges are clearly and obviously the same because they both grow

on trees in orchards.  I would rule that it was not clear or obvious that an entrapment instruction was required in this case.[19]

---

[19] I do agree, however, with my colleague's concurrences that we should revisit our rule on preserving objections to jury instructions.  As ably explained, our rule is not derived from the text of Rule 30(d), no longer fits practice, and is apt to produce unfair results.  I also agree with Part V of the majority opinion.